IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

```
_____  )
United States of America,        )
                                 )
      Plaintiff,                 )
                                 )     Case No: 2:23-cr-00010-HCN
vs.                              )
                                 )
Plastic Surgery Institute        )
of Utah, et al.,                 )
                                 )
      Defendants.                )
_____  )
```

**MOTION HEARING/ORAL RULING BEFORE THE
HONORABLE HOWARD C. NIELSON, JR.**

Date:  November 26, 2025

Time:  2:30 to 5:25 p.m.

Reported by Teena Green, RPR, CRR, CBC

      Orrin G. Hatch United States Courthouse
      351 South West Temple, 7.430
      Salt Lake City, Utah   84101
      (801) 910-4092
      teena_green@utd.uscourts.gov

1                           **APPEARANCES**

2     FOR THE PLAINTIFF:

3     TODD CHRISTOPHER BOUTON
      SACHIKO JEPSON
4     US ATTORNEY'S OFFICE
      111 South Main Street, Suite 1800
5     Salt Lake City, UT   84111-2176
      (801) 524-5682
6     (801) 524-3399
      todd.bouton@usdoj.gov
7     sachiko.jepson@usdoj.gov

8
      FOR DEFENDANT PLASTIC SURGERY INSTITUTE OF UTAH:
9
      BRIAN R. BARNHILL
10    OSBORNE & BARNHILL
      11576 South State Bldg., Suite 204
11    Draper, UT   84020
      (801) 571-2555
12    brian@oblawpc.com

13    FOR DEFENDANT MICHAEL KIRK MOORE, JR.:
      DAVID O. DRAKE
14    DAVID DRAKE PC
      6905 South 1300 East, Suite 248
15    Midvale, UT   84047
      (801) 205-9049
16    sirdrake2033@gmail.com

17    JEFFERY A. BRONSTER
      17 Wendall Plavr
18    Fairview, NJ   07022
      (201) 945-2688
19    jbronster@bronsterlaw.com

20    FOR DEFENDANT KARI DEE BURGOYNE:

21    MICHAEL J. LANGFORD
      LANGFORD | RAMOS PLLC
22    43 East 400 South
      Salt Lake City, UT   84111
23    (801) 328-4090
      mjl@langfordramos.com

24

25

1    FOR DEFENDANT KRISTIN JACKSON ANDERSEN:

2    EDWARD K. BRASS
     BRASS & CORDOVA
3    560 South 300 East, Suite 105
     Salt Lake City, UT    84111
4    (801) 322-5678
     ed@edbrasslaw.com
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

**I N D E X**

**Witness:**                                                    **Page**

KARI BURGOYNE

Direct Examination by Mr. Strain                    26
Cross-Examination by Mr. Bronster                  39
Redirect Examination by Mr. Strain                 61
Cross-Examination by Mr. Bronster                  62

**E X H I B I T S**

Plaintiff's Exhibit No. 1, 2 and 3
Defendants' Exhibit No. D2

```
 1    November 26, 2025                              2:30 p.m.
 2                        P R O C E E D I N G S
 3        THE COURT:  All right.  Good afternoon.  We are here
 4    today for a hearing on the defendant's motion to revoke or
 5    amend the detention order entered by Magistrate Judge Bennett
 6    in the matter of United States versus Michael Kirk Moore,
 7    Case No. 2:23-cr-10-2.
 8            It looks as though Dr. Moore is here today.  Welcome.
 9            Will counsel for the United States introduce
10    themselves.
11        MR. STRAIN:  Jacob Strain, Todd Bouton, and Sachiko
12    Jepson for the United States, Your Honor.
13        THE COURT:  All right.  Welcome, Mr. Strain,
14    Mr. Bouton, and Ms. Jepson.
15            Will counsel for the defendant introduce themselves.
16        MR. BRONSTER:  Jeffrey A. Bronster and David Drake
17    appearing for Dr. Michael Kirk Moore.  Good afternoon,
18    Your Honor.
19            Your Honor, may I ask that the defendant be uncuffed
20    for this hearing?
21        THE COURT:  I'll defer to the marshals on that.  I
22    don't object to it, but I will defer to what they deem proper.
23        US MARSHAL:  We'd rather not, Your Honor.
24        THE COURT:  All right.  I'm not going to overrule
25    this.
```

1          **MR. BARNHILL:**  Brian Barnhill for Plastic Surgery

2    Institute of Utah.

3          **THE COURT:**  All right.  Welcome.

4          **MR. LANGFORD:**  Judge, I'm sorry.  Just for the

5    benefit of the record, Michael Langford on behalf of Ms. Kari

6    Burgoyne.

7          **THE COURT:**  Okay.  Mr. Langford.

8          All right.  Welcome, all of you, Mr. Bronster,

9    Mr. Drake, and then -- remind me.  Let me get -- Mr. Langford

10   for Ms. Burgoyne.

11         And then remind me one more time?

12         **MR. BARNHILL:**  Sure.  Brian Barnhill.

13         **THE COURT:**  Mr. Barnhill for the company.

14         All right.  Any other lawyers that need to make an

15   appearance, or want to do so?

16         All right.  Will the -- do we have the pretrial

17   officer here?

18         **MS. WAHLEN:**  Yes, Your Honor.  Morgan Wahlen.

19         **THE COURT:**  Yes.  Could you say that a little louder?

20         **MS. WAHLEN:**  Morgan Wahlen on behalf of Pretrial.

21         **THE COURT:**  Welcome, Ms. Wahlen.  We appreciate your

22   being here today.

23         All right.  I'm going to begin by summarizing my

24   understanding of the factual and procedural context for the

25   pending motion.

1          Once I do this, I'm going to ask counsel, you know,

2     whether there's anything I'm missing or anything specifically

3     they dispute.  I won't be asking for argument just yet on that,

4     but this is just to kind of make sure that I understand why

5     we're here and how we got here.

6          Dr. Moore is under indictment for conspiracy to

7     defraud the United States, conspiracy to convert, sell, convey,

8     and dispose of Government property, and the conversion, sale,

9     conveyance, or disposal of Government property, as well as

10    aiding and abetting the commission of that offense.

11          Trial is currently scheduled to begin on

12    January 13th, 2025.

13          The Government did not seek Dr. Moore's detention at

14    his arraignment, and on January 26th, 2023, Judge Bennett

15    ordered Dr. Moore released, subject to conditions, after

16    processing by the United States Marshals Service.

17          Among his conditions of release at that time were

18    that Dr. Moore:

19          "maintain or actively seek verifiable employment

20    and/or maintain or commence an educational program as approved

21    by the pretrial officer";

22          "avoid all contact, directly or indirectly, with any

23    person who is or may be an alleged victim, potential witness,

24    and/or codefendant in the investigation or prosecution.  List

25    of persons to be provided to the defendant by the Government

1    within 48 hours.  Defendants will not talk about this case

2    amongst themselves; and

3              "surrender any passport to the United States Clerk of

4    the Court, District of Utah."

5              On May 11th, 2023, Pretrial Services filed a petition

6    alleging that Dr. Moore had violated the conditions of his

7    pretrial release.  After amending the petition, Pretrial

8    Services alleged three violations:

9              First, that Dr. Moore "failed to complete processing

10   by the U.S. Marshals Service, as instructed by the U.S.

11   Pretrial Services office";

12             Second, that Dr. Moore "failed to submit

13   documentation of employment or record of business transactions

14   from Plastic Surgery Institute"; and

15             Third, that Dr. Moore "failed to surrender his

16   passport to the United States Clerk of Court."

17             On May 26th, 2023, Judge Bennett held a hearing on

18   the petition.

19             Although Dr. Moore denied the alleged violations,

20   Judge Bennett found, by clear and convincing evidence, that

21   Dr. Moore had "failed to turn in his passport" and had also

22   "failed to be processed by the Marshals Service as required by

23   this court's order and by the law."

24             Judge Bennett also found that Dr. Moore was unlikely

25   to abide by any condition or combination of conditions of

1    release.

2          Judge Bennett reached this finding based primarily on

3    Dr. Moore's filing of a "voluminous objection to the court's

4    jurisdiction" based on arguments "associated with the sovereign

5    citizen movement."  I'm quoting there, of course, from Judge

6    Bennett's first order.

7          Judge Bennett made clear that his concern was not

8    that Dr. Moore held beliefs associated with the sovereign

9    citizen movement.

10          Rather, Judge Bennett was concerned that this filing,

11   as he put it, "overtly demonstrate[d]" that Dr. Moore "d[id]

12   not believe he must comply with" his conditions of release,

13   given his view that the court lacked jurisdiction over him.

14          Judge Bennett found that Dr. Moore's embrace of this

15   argument "demonstrated his likelihood of continuing to ignore

16   orders of the court."  And, again, I'm quoting there from Judge

17   Bennett's order.

18          Judge Bennett accordingly revoked Dr. Moore's release

19   and ordered him detained.

20          Dr. Moore immediately moved to re-open the detention

21   hearing, representing that he was "prepared to follow any and

22   all conditions for release set by this Court."

23          The Government opposed Dr. Moore's motion, noting

24   that it "lack[ed] any renunciation of his claims that the

25   Court... lacks jurisdiction over him as a 'sovereign citizen.'"

1    In his reply brief, Dr. Moore stated that "it was a
2    significant error in judgment on [his] part" to question the
3    court's jurisdiction over him, and that he d[id] not have any
4    desire other than to comply with court rules and fully submit
5    to its jurisdiction.

6    Judge Bennett held a hearing on Dr. Moore's motion on
7    June 6, 2023, granted the motion, and ordered Dr. Moore
8    released, subject to conditions.

9    Among these conditions were:

10   That Dr. Moore avoid all contact, directly or
11   indirectly, with any person who is or may be an alleged victim,
12   potential witness and/or codefendant in the investigation or
13   the prosecution.  List of persons to be provided to the
14   defendant by the Government.  Defendants will not talk about
15   this case amongst themselves;

16   That Dr. Moore participate in the United States
17   Probation and Pretrial Services Office Computer and Internet
18   Monitoring Program, which included "E-mail and text monitoring
19   by" Pretrial Services;

20   And that Dr. Moore submit to GPS monitoring using an
21   ankle bracelet; although, on August 16, 2023, Judge Bennett
22   ordered the bracelet removed, concluding that Dr. Moore did
23   well on release.

24   On November 4th, 2024, Pretrial Services filed a
25   second petition alleging that Dr. Moore had violated the

1    conditions of his pretrial release.

2         Pretrial Services alleged one pretrial release

3    violation:  "On or about October 17th, 2024, the defendant had

4    contact with those named persons, who are considered either

5    alleged victims, potential witnesses and/or codefendants."

6         Specifically, the Probation Office alleged that

7    Dr. Moore "had contact, via text message, discussing the case

8    with two codefendants."

9         The same day, Judge Bennett approved the petition and

10   issued a warrant for Dr. Moore's arrest.

11        The Government sought revocation of Dr. Moore's

12   pretrial release, offering the following representations that

13   Dr. Moore had violated the condition that "Defendants will not

14   talk about this case amongst themselves."

15        First, the Government represented that Defendant Kari

16   Burgoyne had informed the Government that she, Dr. Moore, and

17   Defendant -- Defendant Andersen, is it Kirsten or Kristin?

18        **MR. STRAIN:**  Kristin, Your Honor.

19        **THE COURT:**  Kristin.  I thought so.  I have a typo in

20   my notes.

21        -- Defendant Kristin Andersen had held "weekly

22   meetings on the third floor of [the Plastic Surgery Institute]

23   to discuss the charges and how to 'get out' of them."

24        According to the Government, Ms. Burgoyne confirmed

25   that "there was at least one meeting like this after Dr. Moore

was released from" his previous pretrial and "recalled specifically that [Dr.] Moore wrapped his GPS ankle monitor with a towel because he feared that probation was listening to his conversations."

Second, the Government represented that Dr. Moore had sent messages using the Signal messaging service to Ms. Burgoyne and Ms. Andersen that "substantively discuss[ed] th[is] case."

The Government provided screenshots of these messages in support of this representation, which indicate that the messages were exchanged among a messaging group named "Legal Defense."  And it represented that, "according to Burgoyne, Moore insisted that the defendants set up the Signal messaging app so they could...communicate covertly."

On November 8, 2024, Judge Bennett held a pretrial release violation hearing.

At this hearing, Dr. Moore conceded that he had sent the Signal messages identified by the Government in its brief.

Dr. Moore argued that these messages did not violate his conditions of release, however.

Dr. Moore did not concede that he had held weekly meetings with Ms. Burgoyne and Ms. Andersen to discuss the case.

Judge Bennett accordingly stated that he was "not going to consider what Ms. Burgoyne has to say until we have an

1    evidentiary hearing."

2          Judge Bennett found by clear and convincing evidence

3    that Dr. Moore had violated the conditions of his pretrial

4    release, based on "the [Signal] messages the defendant sent to

5    his other codefendants."

6          Judge Bennett also found that Dr. Moore was unlikely

7    to abide by any condition or combination of conditions of

8    release, based on the following considerations:

9          Dr. Moore has a history of violating court orders;

10          Dr. Moore -- and, again, these are the considerations

11    invoked by Judge Bennett.

12          Dr. Moore previously refused to recognize the court's

13    jurisdiction and thereby evinced an intent to disobey court

14    orders;

15          And Dr. Moore's use of the Signal messaging service

16    indicated that he had sought to evade "the court ordered

17    monitoring of [his] computer and cellular telephone."

18          As Judge Bennett explained, Dr. Moore's "prior

19    non-compliance along with his current non-compliance show that

20    he is uninterested in abiding by the court's conditions of

21    release."

22          Based on these findings, Judge Bennett revoked

23    Dr. Moore's release and ordered him detained.

24          Dr. Moore then moved to revoke or amend that order,

25    and the Government has filed a response.

1          All right.  I'm not asking for argument just yet, but

2     I want to ask counsel two questions.

3          First, did I get any of the procedural context or the

4     facts wrong, or am I missing anything important?

5          And, second, which portion, if any, of the facts that

6     I have recited do the parties dispute?

7          Mr. Bronster, it's your motion.  I'll let you address

8     those first.  Missing facts and things that you dispute?

9          **MR. BRONSTER:**  The only thing that I would add, as

10    indicated in my brief, is that Judge Bennett did discuss risk

11    of flight and danger to others in the community and did not

12    hold that the evidence created either of those.  He based his

13    decision exclusively on what he believed to be a separate prong

14    of the statute, that he did not believe that Dr. Moore would

15    abide by his conditions of release.

16         **THE COURT:**  So, specifically, he did not make

17    findings that there was a risk of flight or danger, and he did

18    not rely on that.

19         **MR. BRONSTER:**  Correct, Your Honor.  And although he

20    did not make it as a formal holding, there is dicta that I

21    think I noted in my brief that indicated that he did not find

22    those factors to exist.

23         **THE COURT:**  Understood.  All right.  Thank you.

24         Does the Government have anything you'd like to add

25    or any specific disputes?

1          **MR. STRAIN:**  No, Your Honor.

2          **THE COURT:**  All right.  I'm now going to discuss the

3     governing legal standards.  And I realize there is an issue

4     here that we'll bracket for a moment.

5          Dr. Moore brings his motion under 18 USC

6     Section 3145(b), which allows me to revoke or amend a detention

7     order entered by the magistrate judge.

8          In deciding a motion brought under this statute, I

9     review the magistrate judge's detention order de novo, giving

10    it no deference.  That's supported, among other authorities, by

11    *United States v. Cisneros*, 328 F.3d 610, from the Tenth Circuit

12    in 2003.

13         18 USC Section 3148 governs the revocation of

14    pretrial release.

15         Under 18 USC Section 3148(b), I first consider

16    whether there is either, (A) "probable cause to believe that

17    the person has committed a federal, state, or local crime while

18    on release," or (B) "clear and convincing evidence that the

19    person has violated any other condition of release."

20         If I find either of those things, I must next

21    consider whether either, (A) "there is no condition or

22    combination of conditions of release that will assure that the

23    person will not flee or pose a danger to the safety of any

24    other person or the community," or (B) "the person is unlikely

25    to abide by any condition or combination of conditions of

1    release."

2             If, after a hearing, I find at least one of the two

3    alternatives set forth under 3148(b)(1) and one of the two

4    alternatives set forth under 3148(b)(2), the statute requires

5    that I enter an order of revocation and detention.

6             Now, Defendant also notes correctly that the statute

7    includes the following language.  Let me make sure I have it

8    here.

9             If the judicial officer finds that there are

10   conditions of release that will assure that the person will not

11   flee or pose a danger to the safety of any other person or the

12   community, and that the person will abide by such conditions,

13   the judicial officer shall treat this person in accordance with

14   the provisions of Section 3142 of this title and may amend the

15   conditions of release accordingly.

16            And based on that provision, Dr. Moore argues that

17   detention is not permitted under Section 3148(b) unless a

18   defendant poses a risk of flight or a danger to any person or

19   the community.

20            Now, apart from that issue -- and I'm going to give

21   you a chance to argue about that later -- does counsel for

22   either party otherwise disagree with my statement of the

23   governing law?

24            **MR. STRAIN:**  No, Your Honor.

25            **MR. BRONSTER:**  No, Your Honor.

1    **THE COURT:**  All right.  Okay.  Now, before we get to

2    argument, if there's any evidence that the parties want to

3    present, I'm now going to give you the opportunity to do that.

4    I know that the Government indicated that it wishes

5    to present testimony from Ms. Burgoyne.

6    Is that still the case?

7    **MR. STRAIN:**  Yes, it is, Judge.

8    **THE COURT:**  All right.  And does either party wish to

9    present any other evidence?

10    **MR. BRONSTER:**  Your Honor, we'd like to be able to

11    reserve that determination until after we hear the Government's

12    evidence.

13    **THE COURT:**  Okay.

14    Anything else that you would (indiscernible due to a

15    cough in the room), Mr. Strain?

16    **MR. STRAIN:**  I'm sorry?

17    **THE COURT:**  I know that you provided some exhibits as

18    well that I assume you'll discuss in your examination of

19    Ms. Burgoyne.  Is that right?

20    **MR. STRAIN:**  Correct, Your Honor.

21    **THE COURT:**  Other than that, do you have anything in

22    mind for evidence?

23    **MR. STRAIN:**  No, Your Honor, except our Exhibit No. 4

24    is identical to the Defense Exhibit D1.  And just for

25    convenience, we'll just adopt D1 as opposed to our Exhibit 4.

1    It's the same recording.  It's just a longer clip of it.

2           **MR. BRONSTER:**  Yeah, it's the same excerpt as the

3    Government is using, with probably about a minute and a half

4    before it added on.

5           **THE COURT:**  Right.  And I assume you just felt that

6    context was important?

7           **MR. BRONSTER:**  Yes, Your Honor.

8           **THE COURT:**  All right.  That's fine.  We'll just use

9    that one instead.

10          All right.  And then, Mr. Strain, you may proceed.

11   You may call Ms. Burgoyne, if you'd like to do so.

12          **MR. STRAIN:**  Thank you, Your Honor.  We'd call

13   Ms. Kari Burgoyne.

14          **THE COURT:**  All right.  Ms. --

15          **MR. BRONSTER:**  Your Honor, I apologize.  I didn't

16   meant to interrupt.

17          Before Ms. Burgoyne testifies, we have several legal

18   matters.

19          First of all, I believe we would be entitled to know

20   if Ms. Burgoyne has made any deals with the Government prior to

21   her testimony.

22          And we would also like to ascertain for the record --

23   assuming that the answer is no, we would like to ascertain for

24   the record that she is knowingly waiving her Fifth Amendment

25   right here today.  Our cross-examination of her may go into the

1   case somewhat beyond what the prosecutor decides to ask her,

2   and I don't want to be in a position where she's testifying to

3   what they want but is refusing to testify on cross-examination,

4   because then I would have to move to strike.

5        **THE COURT:**  Okay.  With regard to the first issue,

6   I'll just let you ask that on cross-examination, if that's

7   something you wish to address.

8        With regard to the second issue -- well, I want --

9   first of all, each of you, in turn, I want -- first of all, I'm

10  going to let Mr. Langford speak for Ms. Burgoyne, and then I'll

11  let Mr. Strain speak --

12       **MR. LANGFORD:**  Judge, some clarity in terms of the

13  parameters of Ms. Burgoyne's cross-examination might be

14  helpful.

15       Ms. Burgoyne has not resolved her case.  I believe

16  she's still entitled to have some Fifth and Sixth Amendment

17  Constitutional Rights.  So we would just like some parameters.

18       My position is that the only thing that the defense

19  can go into are issues that are relevant to the pretrial

20  release violation; that this should not be a fishing

21  expedition.

22       But we would just like to know what the parameters

23  are in terms of the cross-examination.

24       **THE COURT:**  Okay.  I mean, let's start with -- well,

25  first of all, let me hear everyone before I say anything.

1        Mr. Strain, do you have anything?

2        **MR. STRAIN:**  Yes, Your Honor.  We outlined in our

3   brief what is anticipated that we'll question Ms. Burgoyne

4   about.  And it's almost entirely focused on the pretrial

5   release violations and the time -- her interactions with

6   Dr. Moore post-indictment.  So that will be the main focus of

7   the case -- of our presented evidence.

8        **THE COURT:**  Okay.  I mean, let's talk -- I mean, the

9   ordinary presumption for cross-examination is, you know, number

10  one, it would be limited to the scope of the direct

11  examination, plus to potentially relevant impeachment material.

12       And so I don't know why we would need to go beyond

13  that.

14       Do you disagree with that, Mr. Bronster?

15       **MR. BRONSTER:**  Respectfully, I do, Your Honor.

16  Ms. Burgoyne's credibility is very much in issue.

17       **THE COURT:**  Isn't that impeachment?

18       **MR. BRONSTER:**  I'm sorry, Your Honor?

19       **THE COURT:**  Isn't that impeachment material?

20       **MR. BRONSTER:**  Yes, Your Honor.  I believe that I'd

21  be entitled to cross-examination for impeachment.  And I don't

22  believe that limiting it --

23       **THE COURT:**  That's what I just said.  I said,

24  ordinarily --

25       **MR. BRONSTER:**  Yes.

1          **THE COURT:**  -- it's the scope of direct examination

2    plus impeachment.

3          **MR. BRONSTER:**  I may have misunderstood.  Thank you.

4          **THE COURT:**  Yeah.

5          Okay.  Are there parameters -- I mean, I don't -- are

6    there parameters that -- Mr. Langford and Mr. Strain, that you

7    think I need to impose on -- first -- let's take that one piece

8    at a time.

9          First of all, parameters on cross-examination for the

10   scope of direct.  Is there any reason -- I mean, any reason

11   that they wouldn't be able to ask Ms. Burgoyne on

12   cross-examination about anything within the reasonable scope of

13   direct?

14         **MR. STRAIN:**  There's no reason they wouldn't be able

15   to, Judge.

16         **THE COURT:**  Do you disagree with that, Mr. Langford?

17         **MR. LANGFORD:**  I do not, Your Honor.

18         **THE COURT:**  Okay.  Let's talk about the second,

19   impeachment.  What would be the limits there that you think

20   would be appropriate?

21         **MR. STRAIN:**  Your Honor, for impeachment, as far as I

22   understand it, Ms. Burgoyne has a little bit of criminal

23   history, which we were planning on discussing with her.  She is

24   in a dispute with Dr. Moore about a piece of equipment.  And he

25   also owes her a bunch of money.

1      So those are kind of the three areas where I think

2  the impeachment -- where defense has signaled that they're

3  going, and we're happy to talk to her about all those things.

4      **THE COURT:**  Okay.  Mr. Langford, do you disagree with

5  those being fair game if she testifies?

6      **MR. LANGFORD:**  No.  I'm in agreement with what

7  Mr. Strain just said.

8      **THE COURT:**  Is there anything that you think would be

9  off limits for impeachment, any specific -- I'm not going to --

10  to be clear, I don't want to -- you're not waiving anything by

11  not listing it.  But is there anything that you can think of

12  right now that you are concerned that Dr. Moore's attorneys

13  might try and get to as impeachment that would be problematic?

14      **MR. LANGFORD:**  No, Your Honor.  And I will be

15  listening to Ms. Burgoyne's cross-examination and preparing

16  for --

17      **THE COURT:**  Okay.  Is there anything that we haven't

18  addressed that you would think that you'd want to get into as

19  impeachment matter, Mr. Bronster?

20      **MR. BRONSTER:**  Yes, Your Honor.  I intend to get

21  into -- subject to the Court allowing me to, I intend to get

22  into all the details of the underlying offense.  There are

23  details of that that go very much to the credibility of

24  Ms. Burgoyne.  And I do think that the defendant has a

25  constitutional right of cross-examination that can't be

 1    narrowed for purposes of this hearing.  Either the Government

 2    wants to use her and expose her to that cross, or they don't

 3    have to use her.

 4            THE COURT:  I guess I'll let counsel respond to that.

 5            First of all, Mr. Langford and Mr. Strain?

 6            Mr. Langford?

 7            MR. LANGFORD:  You know, Judge, I don't know what

 8    they're going to go into in terms of their cross.  And so, in

 9    some respects, we'll have to hear what comes out.

10            THE COURT:  I mean, it was clear that -- I think,

11    that Mr. Bronster is planning to examine her about the details

12    of the charged offense.

13            Do you have thoughts about that?

14            MR. LANGFORD:  No, only that she's still entitled to

15    have, you know, Fifth and Sixth Amendment rights and that we

16    would -- like I said, we would want to limit that

17    cross-examination.  You know, I suspect we'll just wait and see

18    how Your Honor rules.  But in some respects, we'll have to wait

19    and see how she testifies and what they go into.

20            THE COURT:  Okay.  Do you have thoughts about that,

21    Mr. Strain?

22            MR. STRAIN:  Your Honor, I would just say the

23    hornbook principle is that cross-examination is usually limited

24    to the scope of direct, and so that's what we'd ask the Court

25    to do.

1          **THE COURT:**  Plus impeachment.

2          **MR. STRAIN:**  Correct, yes.

3          **THE COURT:**  And that's the issue.

4          **MR. STRAIN:**  To the extent that the defense wants to

5   get into the facts of the underlying case to impeach

6   Ms. Burgoyne, I'm not sure how they'd do that.  Maybe there's a

7   clever way.  Without hearing what the question is, it's

8   difficult for me to guess on the fly.

9          **THE COURT:**  All right.  I guess we'll have to see

10  what happens, then.

11         **MR. STRAIN:**  Okay.

12         **THE COURT:**  All right.  Anything else we need to

13  address before we start?

14         **MR. BRONSTER:**  Just for the record, Your Honor,

15  respectfully, my position is that if Ms. Burgoyne is not

16  waiving her Fifth Amendment entirely prior to taking the stand,

17  she should not be permitted to take the stand.

18         **THE COURT:**  All right.  That position -- I'll let

19  counsel respond.

20         Do you have -- either of you want to respond to that?

21         **MR. STRAIN:**  I guess -- so the -- just so that I make

22  sure I understand, the objection to her testifying is that she

23  either has to waive all of her Fifth Amendment privilege or

24  none of it?  Is that --

25         **THE COURT:**  I gather.  I don't think that's the law,

1   but...

2            **MR. STRAIN:**  I don't think that's correct either,

3   Your Honor.

4            **THE COURT:**  Do you have a view about that,

5   Mr. Langford?

6            **MR. LANGFORD:**  No, but there can be a limited waiver

7   for the purposes of her testimony.  That's the way, you know,

8   I've seen it conducted.

9            **THE COURT:**  My understanding of the law -- and I'll,

10  you know, welcome correction -- is that, you know, she would

11  waive the Fifth Amendment with regard to anything she testifies

12  about.  And, you know, she -- like with stuff that's in the

13  reasonable scope of that, she can't just tell part of the story

14  and then stop.

15           Is that consistent with what you all think?

16           **MR. STRAIN:**  Yes, Your Honor.

17           **MR. LANGFORD:**  Yes, Judge.

18           **THE COURT:**  Okay.  So I don't think it's like

19  completely all or nothing, but I do think it's largely -- you

20  know, I do think she does subject herself to questioning within

21  the scope of what she testifies about on direct and reasonable

22  impeachment.

23           All right.  On that understanding, and with your

24  position that perhaps the waiver is broader than that noted on

25  the record, we will proceed, if you'd like to do that.

1    **MR. STRAIN:**  Yes, Your Honor.  We'd call Kari

2    Burgoyne to the stand.

3            **THE COURT:**  All right.  Let's have her come forward

4    and be sworn.

5            **THE COURTROOM DEPUTY:**  If you'll just raise your

6    right hand, please.

7            You do solemnly swear that the testimony you shall

8    give in the case now before the Court to be the truth, the

9    whole truth, and nothing but the truth, so help you God?

10           **THE WITNESS:**  I do.

11           **THE COURTROOM DEPUTY:**  Thank you.  If you'll be

12   seated in the witness box, please.

13                          KARI BURGOYNE,

14    called as a witness for and on behalf of the Plaintiff, being

15      first duly sworn, was examined and testified as follows:

16                     **DIRECT EXAMINATION**

17   **BY MR. STRAIN:**

18   **Q.**   Ms. Burgoyne, can you spell your last name for the court

19   reporter.

20   **A.**   B-U-R-G-O-Y-N-E.

21   **Q.**   Thank you.

22           And did you work at the Plastic Surgery Institute?

23   **A.**   I did.

24   **Q.**   Approximately what dates did you work there?

25   **A.**   September of 2020, I believe, until March of this year.

1    **Q.**   And you were indicted in this case, along with Dr. Moore

2    and Kris Andersen; correct?

3    **A.**   Correct.

4    **Q.**   We're going to speak to you today about things that

5    happened after indictment.

6         But before we press any further, do you have any deals

7    with the Government in this case?

8    **A.**   I do not.

9    **Q.**   Do you have any promises from the Government in this case?

10   **A.**   No.  No.

11   **Q.**   I want to talk to you a little bit about your criminal

12   history.

13        Can you just tell the Court briefly what that is.

14   **A.**   I have a domestic abuse with my ex-husband.

15   **Q.**   Is that a felony or a misdemeanor, do you know?

16   **A.**   I do not know.

17   **Q.**   Okay.  Anything else that you can remember?

18   **A.**   No.

19   **Q.**   Okay.  I want to talk to you a little bit, too, about this

20   device that's the -- that we've talked about just when --

21   before you came to court, we talked a little bit before you

22   testified; correct?

23   **A.**   Correct.

24   **Q.**   And we talked about this medical device that is in your

25   possession; correct?

1    **A.**   Yes.

2    **Q.**   Can you tell us about that.

3    **A.**   So the device was owned by Dr. Kelly, when he owned

4    Revivology.  He sold Revivology to a man named Jeff Mauck and

5    merged with Dr. Moore.  And after that, I spent many times

6    going out and helping train and staffing with Jeff, and Jeff

7    and René gave me that machine.

8    **Q.**   And what is the machine called, again?

9    **A.**   It's a LaseMD.

10    **Q.**   LaseMD?

11    **A.**   Uh-huh.

12    **Q.**   And approximately how much is it worth?

13    **A.**   $10,000.

14    **Q.**   Okay.  Does Mr. -- does Dr. Moore owe you any money?

15    **A.**   Yes, he does.

16    **Q.**   Approximately how much money does he owe you?

17    **A.**   77,000, without interest.

18    **Q.**   Okay.  Can you tell us just briefly how that debt came

19    about?

20    **A.**   He borrowed money from me to make payroll at PSI and to

21    finish some of the basement in that building to open up for a

22    medical spa.

23    **Q.**   Okay.  And do you have a promissory note in that?

24    **A.**   I do.

25    **Q.**   That he signed?

1    **A.**   Yes.

2    **Q.**   Now, you said you left -- PSI, that's Plastic Surgery

3    Institute.  You left PSI in March of this year; correct?

4    **A.**   Correct.

5    **Q.**   And would you say, at the time that you left, that you

6    left on good terms?

7    **A.**   Yes.

8    **Q.**   And why would you say that?

9    **A.**   Because he gave me a card and told me that he was sorry

10   for the -- given everything that had happened, and that he

11   wanted me to come back to work there.  Hugged me.  We cried.

12   **Q.**   I just want to make sure that I understand your motives

13   for testifying today.

14        Do you want to see Dr. Moore in jail?

15   **A.**   Absolute- --

16        **MR. BRONSTER:**  Objection, Your Honor.  It is entirely

17   irrelevant, whether she does or she doesn't.

18        **THE COURT:**  I'll let her answer.

19   **BY MR. STRAIN:**

20   **Q.**   Go ahead, Ms. Burgoyne.

21   **A.**   No, I do not.

22   **Q.**   After you were indicted in January of 2023, you were

23   placed on conditions of release; correct?

24   **A.**   Correct.

25   **Q.**   And one of those conditions was that you were not to have

1    contact with codefendants about the case; correct?

2    **A.**    Correct.

3    **Q.**    And you could still have contact with Dr. Moore, but you

4    couldn't talk about the case; is that right?

5    **A.**    Yes.

6              **MR. BRONSTER:**    Your Honor, I'm sorry.  I have to

7    object to the leading.  If the conditions and her understanding

8    of them are important to this hearing, then her understanding

9    should be coming from her and not from the U.S. attorney.

10             **THE COURT:**    Fair enough.

11             Do you want to restate -- do you want to ask that a

12   different way?

13             **MR. STRAIN:**    Yes, Your Honor.

14   **BY MR. STRAIN:**

15   **Q.**    So when the court put you on conditions, what was your

16   understanding as to what the conditions were with respect to

17   your communications with your codefendants?

18   **A.**    That we were not to discuss the case.

19   **Q.**    Thank you.

20             And did you and Dr. Moore abide by that condition?

21   **A.**    No.

22   **Q.**    Can you tell us how you failed to abide by that condition?

23   **A.**    We had a weekly meeting upstairs on the third floor.

24             **MR. BRONSTER:**    Excuse me.  Your Honor, may I ask that

25   the witness either bring the microphone closer or else speak

1    louder?  I can't hear.

2              **THE COURT:**  Yeah, just bring it a little closer.

3    **BY MR. STRAIN:**

4    **Q.**    There you go.  And you can tilt it down.

5          Okay.  Do you want to repeat your answer?  The question

6    was, how did you fail to abide by that condition?

7    **A.**    We had weekly meetings upstairs on the third floor.

8    **Q.**    On the third floor of --

9    **A.**    Of Plastic Surgery Institute.

10   **Q.**    And who was present at those meetings?

11   **A.**    They would vary.  Kris Andersen, myself, Sandra Flores,

12   Teena Horlacher.  Did I say Kris Andersen?

13   **Q.**    Yes.

14   **A.**    His girlfriend, Alayna.

15   **Q.**    Okay.  And what did you discuss at these meetings?

16   **A.**    Various things.  The money that they had earned from the

17   Givesendgo, different ways to get out of this and get out of

18   trouble.

19   **Q.**    Did you discuss sovereign citizen philosophy?

20   **A.**    Yes.

21   **Q.**    Tell us about that.

22   **A.**    A lady showed up at our office and said that she had a way

23   to get us out of the trouble we were in.

24   **Q.**    Did you invite that lady to the office?

25   **A.**    I did not.

1   **Q.**   Who did?  Do you know who did?

2   **A.**   I don't think anyone did.  She just showed up.

3   **Q.**   Okay.  In these meetings, approximately how long did they

4   last?  I mean, I guess not the individual meetings, but

5   approximately how many meetings do you think you had between

6   January, when you were indicted, and when Dr. Moore was -- the

7   first time he was arrested?

8   **A.**   Probably one a week.

9   **Q.**   Can you clarify who was present at the meetings?  Was

10  Dr. Moore present at the meetings?

11  **A.**   Yes.

12  **Q.**   Was he present at all the meetings?

13  **A.**   Yes.

14  **Q.**   Okay.  And I'm sorry, I -- I missed your answer before.

15      Between January and, let's see, it would have been May of

16  2023, so about four months --

17  **A.**   One a week.

18  **Q.**   You had one meeting a week?

19  **A.**   Yes.

20  **Q.**   So approximately 16 meetings?

21  **A.**   That sounds accurate.

22  **Q.**   And in those meetings, did you discuss this case?

23  **A.**   Yes.

24  **Q.**   And did you discuss the case substantively?

25          **MR. BRONSTER:**  Objection.  The question is vague,

Your Honor.

        **MR. STRAIN:**  I'll withdraw it.

        **THE COURT:**  Yeah, I'll let -- okay.

        **MR. STRAIN:**  I'll withdraw it, Judge.

        **THE COURT:**  Okay.  Go ahead.

**BY MR. STRAIN:**

**Q.**  Ms. Burgoyne, after you were indicted, was there still COVID-19 vaccine on site at PSI?

**A.**  Yes.

**Q.**  Where was that?

**A.**  On the third floor, in the freezer.

**Q.**  And, again, after indictment, what happened to that vaccine?

**A.**  I took it home and disposed of it.

**Q.**  Why?

**A.**  Because Dr. Moore asked me to.

**Q.**  And did you follow his instructions?

**A.**  I did.

**Q.**  At some point -- Dr. Moore was arrested in May of 2023. Do you remember that?

**A.**  I do.

**Q.**  So -- and then he was released from custody; correct?

**A.**  Correct.

**Q.**  Did you have any meetings with him to discuss the case after that?

1    **A.**    Yes.

2    **Q.**    Approximately how many meetings did you have with him?

3    **A.**    I recall one, for sure.  I'm sure there were others.

4    **Q.**    And tell us about this one meeting that you remember.

5         What do you remember about it?

6    **A.**    He wrapped a towel around his ankle monitor and made me

7    leave my phone and watch in my office so we could discuss it.

8    **Q.**    And why did he want you to do that?

9    **A.**    So that no one could hear what we were talking about.

10   **Q.**    Ms. Burgoyne, we have some messages from Signal.

11        Do you use the Signal app?

12   **A.**    I do not.

13   **Q.**    But you used the Signal app in this case?

14   **A.**    Correct.

15   **Q.**    Why?

16   **A.**    Dr. Moore asked me to set that up so that we could

17   communicate that way.

18        **MR. STRAIN:**  May I approach, Your Honor?

19        **THE COURT:**  You may.

20   **BY MR. STRAIN:**

21   **Q.**    I'm going to show you Government's Exhibits 1, 2, 3--

22   Ms. Burgoyne, will you please look at those three exhibits.

23        What are those?

24   **A.**    They're text messages.

25   **Q.**    From what?

1    **A.**    From Signal.

2    **Q.**    Okay.  And are these pictures of your phone?

3    **A.**    Yes.

4    **Q.**    And did you provide these messages to us when we met with

5    you in October?

6    **A.**    I did.

7    **Q.**    Let's talk about who was participating in these messages

8    on Signal.

9         It states "Legal Defense."

10        Did you come up with that name?

11   **A.**    I did not.

12   **Q.**    Do you know who did?

13   **A.**    No, I do not.

14   **Q.**    It says three members.

15        Who are the three members of this chat?

16   **A.**    Myself, Kris Andersen, and Dr. Moore.

17   **Q.**    And did you set up the three members?

18   **A.**    I did not.

19            **MR. STRAIN:**  I'll read into the record, Your Honor.

20            This one says, "Dr. Moore added you to the group.

21            "Dr. Moore:  Kris, Kari, as you both know, we have a

22   hearing tomorrow about our motion to dismiss, MTD.  It would be

23   beneficial if you and your attorneys would be there.  Kari, can

24   you speak to my attorneys and answer some of their questions

25   regarding how we obtained the vials and cards, who we

1    contacted, who delivered them, et cetera?  That's part of the

2    process I was not really involved in.  Kris, do you know of any

3    of our patients that would be willing to testify to the true

4    necessity of them getting a card that permitted them to stay

5    employed, get medical procedures, travel for work, care for a

6    family member, et cetera?  We may need some of those if we lose

7    the MTD and prevail in the motion to allow a necessity defense.

8    Thank you."

9         And then a message from Kris that says, "Yes, I will

10   work on it."

11   **BY MR. STRAIN:**

12   **Q.**   Ms. Burgoyne, did I read that correctly?

13   **A.**   Yes.

14   **Q.**   And listed here, it says "Dr. Moore, Kris, and Kari."

15        Can you just, again, briefly identify who those people

16   are.

17   **A.**   Dr. Moore, Kris Andersen, and myself.

18   **Q.**   Okay.

19        **MR. STRAIN:**  All right.  I want to go to Government's

20   Exhibit No. 2.

21        And, Judge, we noticed an issue in Government's

22   Exhibit No. 3 that I want to bring to the Court's attention.

23   **BY MR. STRAIN:**

24   **Q.**   But before we get there, Exhibit No. 2, it says -- I've

25   already read, "Yes, I will work on it," from Kris.  Then it

1    says, "Bethany, last person, kidney transplant."

2        Who wrote that?

3    **A.**    Kris.

4    **Q.**    Okay.  And then the next message, Dr. Moore says -- it

5    says, "Dr. Moore:  I will have Jeff reach out to you."

6        Do you know who wrote that?

7    **A.**    Dr. Moore.

8    **Q.**    Did you write, respond in this messages chat at all?

9    **A.**    I did not.

10    **Q.**    Okay.

11        **MR. STRAIN:**  Your Honor, that's where the issue comes

12    up with Exhibit No. 3.  I think I previously represented to the

13    Court in our filing that it was Ms. Burgoyne that stated,

14    "Bethany, last person, kidney transplant."  Apparently, that

15    was Ms. Andersen.  And also, it looks like, in Exhibit No. 3,

16    we were under the assumption, with that little "K," that it was

17    from Dr. Moore, but it looks like "the music, take it all

18    back," was from Kris.

19    **BY MR. STRAIN:**

20    **Q.**    And "let's do this one" done -- "let's do this one and

21    done today," Ms. Burgoyne, do you know who wrote that?

22    **A.**    Kris.

23    **Q.**    Okay.

24        **MR. STRAIN:**  So we were incorrect in our filing.  It

25    wasn't Dr. Moore that said that.  It was Kris Andersen.

1    **BY MR. STRAIN:**

2    **Q.**   So what was your -- was your understanding that these

3    messages were about the case?

4            **MR. BRONSTER:**  Objection.  Your Honor, her

5    understanding is completely irrelevant.

6            **THE COURT:**  Overruled.

7            You can answer the question.

8            **THE WITNESS:**  Yes.

9            **MR. STRAIN:**  We'll leave it there, Judge.

10           **THE COURT:**  Okay.  All right.

11           **MR. STRAIN:**  Oh, sorry, Your Honor.  If we could move

12   to admit Exhibits 1 through 3.

13           **THE COURT:**  I mean, I don't know that there's a

14   formal record here, given that it's a -- you know, it's a

15   detention hearing, but, yes, they're admitted.

16           (Plaintiff's Exhibits 1, 2, and 3 were received into

17   evidence.)

18           **MR. STRAIN:**  Thank you, Your Honor.

19           **THE COURT:**  Okay.

20           All right.  Do you have anything, Mr. Langford?

21           **MR. LANGFORD:**  I do not, Judge.

22           **THE COURT:**  All right.  Mr. Bronster, if you want to

23   cross-examine the witness, you may do so.

24           **MR. BRONSTER:**  Thank you, Your Honor.

25   /

## CROSS-EXAMINATION

**BY MR. BRONSTER:**

**Q.**   Ms. Burgoyne, I believe that somewhere in the Government's papers, they've described you, if I remember correctly, with the words "sweet and innocent."  So let me start with your criminal conviction for domestic abuse.

Was it a misdemeanor or a felony?

**A.**   I do not remember.

**Q.**   You don't even know if you are sitting here today testifying as a convicted felon?

**A.**   I do not have a felony.  No, I'm not a convicted felon.

**Q.**   Okay.  So how come, a few minutes ago, you didn't know if it was a felony or a misdemeanor, but now you're sure it is?

**A.**   I believe it was originally, and then I believe they dropped it or reduced it.

**Q.**   Ah.  So somebody charged you and accused you of committing a felony, and you pled guilty to something less.

**A.**   (No audible response.)

**Q.**   Correct?

**A.**   Yes.

**Q.**   Do you even know?

**A.**   No, I don't.  It was long ago.  It was something that I tried to put in my past.

**Q.**   I can well imagine.

We'll talk about some other things that you have

1    apparently put in your past.

2        You understand the charges that the Government has made

3    against the defendants in this case?

4    **A.**    Not fully, to be honest.

5    **Q.**    Okay.  Do you understand the facts, as the Government has

6    laid them out, of what supposedly happened?

7    **A.**    Yes.

8    **Q.**    And were you a personal participant in some of the

9    activities that the Government has claimed to be criminal,

10   whether you agree that they're criminal or not?

11   **A.**    Yes.

12   **Q.**    Okay.  Now, when you were released and you say you had

13   these meetings once a week, you were actually at these

14   meetings; correct?

15   **A.**    Yes.

16   **Q.**    Did you believe, at that time, that you were violating the

17   conditions of your release?

18   **A.**    I'm not sure that I did.  I...

19   **Q.**    Well, think back.

20       Did you ever sit there in those meetings believing or

21   saying to yourself, "I really shouldn't be doing this.  This is

22   violating the terms that I was released on"?

23   **A.**    Yes, I did believe that.

24   **Q.**    Okay.  So, then, the answer that you gave me two minutes

25   ago was not the truth, was it?

1    **A.**    Yes, it was the truth.

2    **Q.**    Okay.  Well, your first answer was you didn't really think

3    about it, and your second answer was you did.

4         Did you have an actual knowledge at that time that you

5    were violating the Court's orders every single week for that

6    entire 16-week period?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, when did those meetings end?

9    **A.**    I'm not really sure.

10   **Q.**    Give me, please, your best approximation of the month when

11   those meetings ended.

12   **A.**    I honestly do not know.

13   **Q.**    All right.  Well, let's go back.

14        When did you leave Dr. Moore's employ?

15   **A.**    March.

16   **Q.**    Of this year?

17   **A.**    Correct.

18   **Q.**    Were the meetings still going on at that time?

19   **A.**    No.

20   **Q.**    Had there been any meetings in the calendar year 2004

21   [sic]?

22   **A.**    No.

23             **THE COURT:**    2004 --

24   BY MR. BRONSTER:

25   **Q.**    Do you recall whether there were --

1           **THE COURT:**  Sorry.  You meant 2024; right?

2           **MR. BRONSTER:**  I apologize.  Of course.  Yes, 2024,

3 of course.

4 **BY MR. BRONSTER:**

5 **Q.**  Do you remember if you were having any such meetings by

6 Halloween in 2023?

7 **A.**  I don't recall.

8 **Q.**  Okay.  How many days after the last meeting did you

9 suddenly realize that you needed to come forward and let the

10 Government know what you had done?  Was it one week, two weeks?

11 **A.**  I came forward when I got a text.  I wanted to get away

12 from all of this.  That's why I left Plastic Surgery Institute.

13 **Q.**  I'm sure you did, and I'm sure you still do, but that's

14 not the question.

15     The question is, after the conclusion of these meetings,

16 where for 16 weeks you sat there and told yourself, "Oh, my

17 God, I'm violating the Court's order," how soon did you go to

18 the Government and tell them, "I did this; I'm sorry; it was

19 wrong"?

20 **A.**  I don't think I've done that.

21 **Q.**  Even as of today?

22 **A.**  I've said I've done it -- that I made a mistake.

23 **Q.**  Okay.  So my question -- I'll rephrase.

24     How soon after the last time you made that mistake by

25 having a meeting like that did you go to the Government to fess

1   up about your error in judgment?  Was it one week?  Was it two

2   weeks?  How long?

3   **A.**   The only time I met with the Government was in October.

4   **Q.**   Okay.  October of '24?

5   **A.**   Correct.

6   **Q.**   So more than likely, we're talking about it being perhaps

7   a year or more after the fact that you actually came to the

8   Government?

9   **A.**   Yes.

10  **Q.**   After a trial date was set for January of 2025; correct?

11  **A.**   I don't recall whether the date was set or not.

12  **Q.**   Okay.  Now, with the text messages that we've looked at,

13  are you the person who set up the Signal account?

14  **A.**   No.

15  **Q.**   Who set up the Signal account?

16  **A.**   I do not know.

17  **Q.**   How did you happen to get to be on it that someone was

18  able to contact you?  Well, withdrawn.

19       Did you have a Signal account before these texts with

20  Dr. Moore?

21  **A.**   No.

22  **Q.**   Okay.  Did you have to have a Signal account set up in

23  order to have these texts with Dr. Moore?

24  **A.**   I believe so.

25  **Q.**   How did it come about that you suddenly had a Signal

1    account?

2    **A.**    I set one up.

3    **Q.**    And why did you set one up?  How did that happen?

4    **A.**    Dr. Moore asked me to.

5    **Q.**    Okay.  And did you say to Dr. Moore at the time, "I don't

6    want to do that.  I'm worried that might be a violation of our

7    release conditions"?

8    **A.**    I did not.

9    **Q.**    Okay.  You simply went ahead and set it up; correct?

10    **A.**    Correct.

11    **Q.**    Were you planning on that time as using that as a way to

12    go to the Government to try to get yourself a better deal?

13    **A.**    Absolutely not.

14    **Q.**    Well, then, why did you do it?  You had already told

15    yourself that you had violated the conditions of release by

16    having all those meetings, but that was, as you say, in the

17    past.  You wanted to get away from that.

18         So when Dr. Moore asked you to set up this Signal account

19    that you knew in your mind would put you again in violation of

20    the Court's orders, why did you do it?

21    **A.**    I set that up prior to, when we were having meetings.  The

22    Signal app was set up when we were still having the meetings.

23    **Q.**    Ah.  So the Signal account was not just set up recently.

24    It was set up well over a year ago?

25    **A.**    Yes.

1   **Q.**   Okay.  Had you ever used that Signal account up until the

2   texts that we saw here today?

3   **A.**   I used it prior to.

4   **Q.**   Did you give those texts to the Government that you had

5   participated in prior to the one chain of texts that they've

6   put into evidence here today?

7   **A.**   I did not.

8   **Q.**   Well, but you know that those were violations -- as far as

9   you're concerned, those were violations of your parole.

10      When you decided to come clean now with the Government,

11   didn't you think you ought to give them everything?

12   **A.**   Yes, I -- yes, I -- I didn't think about it, to be honest

13   with you.  I -- he had inactivated that account.  And then it

14   came through on my phone, and that's when I saw that it was

15   still there.  I had not used it.  I had not been privy to any

16   of it.

17   **Q.**   Okay.  But when you saw it was still there, that's before

18   you went to the Government, obviously, because we have this new

19   chain of texts; right?

20   **A.**   Yes.

21   **Q.**   You having been reminded that this account had been set up

22   a year before and obviously knowing, as you have told us now,

23   that you had had prior texts on that Signal account, why did

24   you make the decision not to give the Government any of your

25   prior communications?

1  **A.**   I don't have it.

2  **Q.**   How is that possible?  Did you -- well, withdrawn.

3        Let me ask you this:  When you went into the Government

4  and were interviewed by them on October 31st, did you tell them

5  that this was not the first time that you had been part of an

6  exchange on the Signal account?

7  **A.**   I did not.

8  **Q.**   So the Government is actually learning it for the first

9  time right now, listening to your cross-examination; correct?

10 **A.**   Correct.

11 **Q.**   Ms. Burgoyne, you talked about disposing of certain

12 vaccine that you took home, supposedly at Dr. Moore's request,

13 and disposed of.

14       Isn't it true that even before you were ever arrested in

15 this case, that that was the routine procedure?  You would take

16 vaccine home and dispose of it, and you had done it many times

17 before; is that not correct?

18 **A.**   That is not correct.

19 **Q.**   Had you ever done it before?

20 **A.**   No.

21 **Q.**   Who is   * all   Zadie?

22 **A.**   She's the woman that came into the office that suggested

23 the sovereign citizen.

24 **Q.**   You had communications directly with Zadie, did you not?

25 **A.**   I did.

1  **Q.**   You had phone calls with Zadie; correct?

2  **A.**   Correct.

3  **Q.**   Texts, e-mails?

4  **A.**   Probably.

5  **Q.**   And, in fact, during a time that Dr. Moore was sitting in

6  prison and was not able to communicate with anyone, you are the

7  one who was communicating with Zadie, were you not?

8  **A.**   She would call the office, yes.

9  **Q.**   That didn't answer my question.

10     You were the one who was communicating with Zadie, were

11  you not?

12  **A.**   Yes.

13  **Q.**   You put in a motion, like Dr. Kirk [sic] did -- I'm sorry,

14  like Dr. Moore did, espousing the sovereign citizen doctrine,

15  did you not?

16  **A.**   I did.

17  **Q.**   Excuse me?

18  **A.**   I did.

19  **Q.**   Did you believe in it?

20  **A.**   No.

21  **Q.**   You did it for strategic reasons; correct?

22  **A.**   Yes, I believe so.

23  **Q.**   And at a certain point, when you realized that strategy

24  was not working out the way that you had hoped, you withdrew

25  it; correct?

1    **A.**    Yes.

2    **Q.**    So the fact that you put those papers in, that doesn't

3    mean that you are a member of the -- a card-carrying member of

4    the sovereign citizen movement, looking to somehow overthrow

5    the jurisdiction of the United States of America, does it?

6    **A.**    No.

7    **Q.**    Okay.  And if I'm not mistaken, I believe Dr. Moore

8    withdrew, at some point, his motion as well on the sovereign

9    citizen issue.  You know that; correct?

10   **A.**    I do.

11   **Q.**    What specific actions did you take in the Plastic Surgery

12   practice to further patients getting vaccine cards?  What was

13   your personal involvement?

14   **A.**    I called the health department to find out what we needed

15   to do.  I took the tests for Dr. Moore and Dr. Kelly.  And had

16   the vaccines delivered to our office.

17   **Q.**    I didn't quite follow one thing.  Tell me what you meant

18   when you say you took the tests for Dr. Moore.

19          **MR. STRAIN:**  Your Honor, I'm going to object.  Beyond

20   the scope of direct examination.

21          **THE COURT:**  I'm going to sustain that.

22          **MR. BRONSTER:**  Respectfully, Your Honor, the witness

23   is holding herself out as someone who has knowledge of all of

24   these events, who has knowledge of Dr. Moore's motives after

25   the fact, and having meetings and such, and her credibility.

| | |
|---|---|
| 1 | **THE COURT:**  I think this goes both beyond the scope |
| 2 | of direct and beyond what's necessary for reasonable grounds of |
| 3 | impeachment. |
| 4 | **MR. BRONSTER:**  Understood, Your Honor. |
| 5 | BY MR. BRONSTER: |
| 6 | **Q.**   Do you acknowledge -- let's ask it as a general question. |
| 7 | Do you acknowledge, Ms. Burgoyne, that during the course |
| 8 | of your employment for Dr. Moore, that you committed acts that |
| 9 | are criminal? |
| 10 | **A.**   Yes. |
| 11 | **Q.**   Now, without getting into the details, there is a civil |
| 12 | suit pending right now that you filed against Dr. Moore; |
| 13 | correct? |
| 14 | **A.**   Correct. |
| 15 | **Q.**   And what you're looking for in those cases is money; |
| 16 | correct? |
| 17 | **A.**   Correct. |
| 18 | **Q.**   And those cases were pending before you went to the |
| 19 | Government to talk about any of this; correct? |
| 20 | **A.**   Correct. |
| 21 | **Q.**   Now, you testified before that you don't want to see |
| 22 | Dr. Moore in jail. |
| 23 | Did I understand you correctly? |
| 24 | **A.**   Yes, you did. |
| 25 | **Q.**   You heard some discussion in the courtroom, I believe, |

1    earlier about something called the Fifth Amendment.  Is that

2    correct?

3    **A.**    Yes.

4    **Q.**    And are you aware that you have the right, and had the

5    right, rather than being forced to testify, to invoke the Fifth

6    Amendment if you so chose?

7    **A.**    I don't understand what that means.

8    **Q.**    You have a lawyer; right?

9    **A.**    I do.

10   **Q.**    And you didn't think it important enough to discuss with

11   your lawyer what your choices were here today and what your

12   legal rights were?

13   **A.**    I have discussed them with him.

14   **Q.**    Ah, okay.

15        Was it your understanding from anyone that you have no

16   choice but to testify here today?

17   **A.**    No.

18   **Q.**    Okay.  You understand that you had a choice?

19   **A.**    Yes.

20   **Q.**    Okay.  And you understand that if you had exercised the

21   choice not to testify and exercised your Fifth Amendment right,

22   the Government couldn't do anything to punish you for that;

23   correct?

24   **A.**    Correct.

25   **Q.**    And you understand that the entire purpose of this hearing

1   is the Government attempting to keep Dr. Moore in jail;

2   correct?

3   **A.**   No, I did not understand that.  I don't understand a lot

4   of this.  I'm sorry.

5   **Q.**   I'm sure.

6         But in all of your discussions with the Government, with

7   your attorneys, no one's ever mentioned to you that the reason

8   all of us are in court today is because the Government is

9   holding a hearing to try to detain Dr. Moore?

10  **A.**   No.

11  **Q.**   You never heard that at all?

12  **A.**   No.

13  **Q.**   Okay.  And your lawyer never explained that to you?

14  **A.**   No.

15         **MR. LANGFORD:**   Judge, I think defense counsel is

16  going into some lines that violate attorney/client privilege.

17  I would make an objection.

18         **MR. DRAKE:**   After the fact.

19         **THE COURT:**   Okay.  Well, I will -- that might have

20  been a better objection just a couple questions ago.  But I

21  think I am going to hold the line at the point -- to not go

22  further than what's already been discussed.

23         **MR. BRONSTER:**   I do respectfully, Your Honor,

24  maintain that attorney/client privilege does not apply because

25  it has been waived by her testimony about what she did or did

1     not understand, even after talking to her lawyer, about today's

2     hearing.  And in fact, it had been my intention, if Your Honor

3     permits it, to call her attorney as my next witness, to discuss

4     the remarkable proposition that the witness has no idea what

5     this hearing is for.

6              **THE COURT:**  All right.  Well, I'm not going to -- I'm

7     not going to let you do that.

8              **MR. BRONSTER:**  Thank you, Your Honor.

9              **THE COURT:**  I will -- as I said, I'm going to draw

10    the line where it's -- you know, I'll let you, if you choose to

11    do so, ask about issues that have already been disclosed but

12    not about issues that have not yet been disclosed.

13             **MR. BRONSTER:**  Thank you, Your Honor.

14             Your Honor, may I ask the Court for a brief recess to

15    confer with my client and co-counsel?  Especially with

16    Dr. Moore being in jail, I had no way to prepare for what this

17    testimony might be.

18             **THE COURT:**  How long do you think you need?

19             **MR. BRONSTER:**  Ten minutes would be the very most.

20             **THE COURT:**  Let me ask about this before we do that.

21             In terms of timing, I guess, at the time I set this

22    hearing, I didn't anticipate how long it might potentially

23    take.

24             In terms of argument -- so you want about ten minutes

25    to talk to your client.

```
 1          In terms of argument and so forth, how long -- I've
 2   read the briefs, so I'm not going to need extensive -- I'm
 3   going to want argument about the import of the evidence that
 4   we've heard today.  And, you know, I'll permit argument on the
 5   issues raised in the brief, though I don't need you to go
 6   through them blow by blow.  I've read them carefully.
 7          Do the parties have a sense of about how much time
 8   they're likely going to need for argument?
 9          MR. BRONSTER:  For the defendant, Your Honor, I would
10   ask for 30 minutes, with the intention of not using it,
11   hopefully.
12          THE COURT:  Yeah.  I'm just trying to decide the best
13   way to proceed.  I know that our -- because, at least as of
14   today, Dr. Moore is incarcerated.  He doesn't -- you know,
15   there's a lot of logistical issues with transportation to and
16   from the jails with -- if we go extremely late tonight, I think
17   that would cause trouble for the marshals in getting Dr. Moore
18   back.
19          I'm trying to decide whether we can finish in a
20   reasonable time today or whether we should recess and try and
21   finish this tomorrow.  I guess I'd like to hear the parties'
22   thoughts about that.
23          MR. BRONSTER:  From the defense point of view, I
24   would much rather finish it today.  As a personal matter, which
25   is not the overriding concern, I'd like to be home for
```

1    Thanksgiving.

2            **THE COURT:**  Hopefully, that would be regardless, but

3    probably --

4            **MR. BRONSTER:**  Well, travel tomorrow.  I mean, I'm

5    traveling on a midnight flight tonight.

6            **THE COURT:**  Do you think we can wrap up within an

7    hour?  I'm -- you know, if I issue a ruling, I'm going to need

8    some time for that.  I mean, so -- less than a half hour, plus

9    your recess.

10           How much time do you think you need to argue?

11           **MR. STRAIN:**  I'll be very brief, Your Honor.

12           **THE COURT:**  Okay.  Because I think both of you have

13   set out your positions quite clearly in the briefs, and I

14   understand them and have given them some careful review and

15   thought.

16           Okay.  Let's -- we'll try and finish today.  But

17   let's do try and be relatively concise.

18           I will give you ten minutes now to confer with your

19   client, and then we'll come back and try and wrap up

20   expeditiously, just so that you can get on your plane, so that

21   the marshals can get -- if appropriate, you know, depending on

22   what I rule, I want to make sure that it's not too late for the

23   marshals to be able to take care of things.

24           **MR. BRONSTER:**  Thank you, Your Honor.  Is there --

25   can provisions be made for me to speak to my client in one of

```
1    the attorney conference rooms?

2              THE COURT:  I -- let me ask the marshals.

3              What would -- I think I -- I do want to give

4    Dr. Moore the chance to talk to Mr. Bronster, just -- I think

5    that's appropriate.

6              What would be the best way to do that, from your

7    perspective?

8              US MARSHAL:  We can do it right here, in this little

9    room right here.

10             THE COURT:  And could that just be the two of them?

11             US MARSHAL:  Yeah.

12             THE COURT:  And possibly Mr. Drake, the other lawyer?

13             US MARSHAL:  Yeah.

14             THE COURT:  Okay.  There's a room you can use right

15   there.

16             MR. BRONSTER:  Thank you very much, Your Honor.

17             THE COURT:  All right.  Thank you.

18             We'll take a ten-minute recess.

19             (A recess was taken.)

20             THE COURT:  All right.  Let's see.  Before we decide

21   what we're doing next, Mr. Bronster, did you have any more

22   questions for Ms. Burgoyne?

23             MR. BRONSTER:  I do not, Your Honor.

24             THE COURT:  And did you have any redirect?

25             MR. STRAIN:  Your Honor, could I just make -- I have
```

```
 1   two redirect questions.

 2           THE COURT:  All right.  Let's have Ms. Burgoyne

 3   return to the stand.

 4           You remain under oath, of course.

 5           Is she in the --

 6           MR. STRAIN:  I think she's just outside, Judge.  Can

 7   I run and grab her?

 8           THE COURT:  Yeah.

 9           MR. BRONSTER:  Your Honor, my apologies.  My client

10   just pointed out to me there was one thing, and it's very

11   brief, that I did still want to do, if that's all right.

12           THE COURT:  Okay.  Yes.

13           Ms. Burgoyne, I'll let you remain under oath, and

14   you'll continue.  There's a few more questions for you.

15           MR. BRONSTER:  Thank you, Your Honor.

16           THE COURT:  All right.  You may proceed,

17   Mr. Bronster.

18                   CROSS-EXAMINATION (CONTINUED)

19   BY MR. BRONSTER:

20   Q.  Ms. Burgoyne, in the Government's papers, they indicated

21   that Dr. Moore's counsel had provided false information.

22           And in our brief, we had stated that there was a joint

23   defense agreement among the defendants.  And according to the

24   Government's brief, you have informed them that there has never

25   been such an agreement.
```

1      Did they quote you correctly on that?

2           **MR. STRAIN:**  Your Honor, that misstates the

3   Government's brief.  That's not what we allege.  I think it was

4   from Ms. Andersen, Ms. Andersen's attorney, Ed Brass.

5           **MR. BRONSTER:**  All right.  In that case -- I would

6   have to check their brief.  But if that's the case, then my

7   question is withdrawn.

8   **BY MR. BRONSTER:**

9   **Q.**   Did you, in fact, have a joint defense agreement with your

10  codefendants?

11  **A.**   I don't know what that means.

12  **Q.**   Okay.  A joint defense agreement is a written document

13  whereby defendants in a case agree to work together, to some

14  extent.  I won't get into the legal technicalities.  But it's a

15  vehicle for certain types of communications taking place.

16      Do you know if you ever had such a document?

17  **A.**   No, I don't believe so.

18  **Q.**   Okay.  Well, were you ever represented by a different

19  attorney in this case?

20  **A.**   I was.

21  **Q.**   What was the name of your first attorney?

22      Let me give you a name and see if it rings a bell, except

23  that I'm not sure how to pronounce it.  The first name is Earl,

24  and the last name is spelled X-A-I-Z.

25      Does that mean anything to you?

1  **A.**   Xaiz.

2  **Q.**   Say it again?

3  **A.**   Xaiz.

4  **Q.**   Okay.  Did Mr. Xaiz represent you?

5  **A.**   Yes.

6  **Q.**   Okay.

7        **MR. BRONSTER:**  Your Honor -- well, withdrawn.

8  **BY MR. BRONSTER:**

9  **Q.**   Did Mr. Xaiz ever explain to you that he had signed an

10 agreement on your behalf that, in the agreement, made you a

11 party --

12        **MR. LANGFORD:**  Objection --

13 **BY MR. BRONSTER:**

14 **Q.**   -- to that agreement?

15        **THE COURT:**  There's objections here.

16        **MR. LANGFORD:**  Judge, I want to make an objection.

17        Attorney/client privilege.

18        **THE COURT:**  Yeah, I'll sustain that.

19        **MR. BRONSTER:**  May I approach the witness to show her

20 something, Your Honor, a document?

21        **THE COURT:**  Possibly.  Yeah, let me -- why don't you

22 all come forward, just the lawyers.

23        (Sidebar conference.)

24        **MR. BRONSTER:**  Your Honor, this is a --

25        **THE COURT:**  So for the current purposes, you need to

 1   speak into this.

 2          **MR. BRONSTER:**  This is a joint defense agreement

 3   signed by all counsel, including Mr. Xaiz, which, in the body

 4   of it, says that, "By signing this agreement, each of the

 5   undersigned counsel hereby certifies that the contents of the

 6   agreement have been explained to the respective client and that

 7   each client has become a party and participant in this

 8   agreement."

 9          I'm going to want to offer it, and I was trying to

10   establish a foundation.

11          **THE COURT:**  I mean, is there any objection to just

12   admitting it, rather than asking her about it?

13          **MR. LANGFORD:**  I wouldn't have an objection to

14   admitting it.  I would, of course, have an objection to

15   discussing the details about it.

16          **MR. BRONSTER:**  I agree.  I would not.

17          **MR. STRAIN:**  I have no objection.

18          **THE COURT:**  Why don't you just proffer it.

19          **MR. BRONSTER:**  Thank you.

20          **THE COURT:**  I think that avoids the issues of

21   attorney/client communications.

22          **MR. BRONSTER:**  Very good.  Thank you.

23          (End of sidebar conference.)

24          **MR. BRONSTER:**  All right.  Your Honor, with the

25   gracious consent of all counsel, I'm going to offer the

1    document without any further foundation.

2             **THE COURT:**  All right.  It's admitted, to the extent

3    we're admitting things today.  And what shall we call it?  You

4    had one exhibit, I think --

5             **MR. BRONSTER:**  Correct.

6             **THE COURT:**  Is this D2, then?

7             **MR. BRONSTER:**  It is, Your Honor.

8             **THE COURT:**  All right.  We'll admit it as D2.

9             (Defendants' Exhibit D2 was received into evidence.)

10            **MR. BRONSTER:**  And shall I submit this to the Court?

11            **THE COURT:**  If you can.  If you have a copy for me

12   and the Government.

13            **MR. BRONSTER:**  I believe that because of time

14   constraints, I only have one other copy.  I'm glad to give it

15   to whichever Your Honor prefers.

16            **THE COURT:**  Give it to the Government right now, and

17   then I'll look at it if -- you know, we'll share it.  But give

18   it to the Government now.

19            **MR. BRONSTER:**  Thank you, Your Honor.  I'll hand my

20   copy up for the Court's retention, if it wants it.

21            **THE COURT:**  All right.  Why don't we do that.

22            **MR. BRONSTER:**  With that, I have no further questions

23   for the witness, Your Honor.

24            **THE COURT:**  All right.

25            **MR. BRONSTER:**  Thank you, Ms. Burgoyne.

1    **THE COURT:**  All right.  Thank you.

2    Mr. Strain, if you have redirect, you may ask some

3    questions.

### REDIRECT EXAMINATION

5    BY MR. STRAIN:

6    **Q.**  Ms. Burgoyne, when we met October 31st, I -- earlier, I

7    asked you if you had any promises with the Government.

8    When we met on October 31st, we signed what's called a

9    proffer agreement.

10    Do you remember that?

11    **A.**  I do.

12    **MR. STRAIN:**  And, Your Honor, we did provide that

13    proffer agreement to defense counsel previously in discovery.

14    BY MR. STRAIN:

15    **Q.**  Last question.

16    Ms. Burgoyne, are you vaccinated with the COVID-19

17    vaccine?

18    **A.**  Yes, I am.

19    **Q.**  Thank you.

20    **MR. BRONSTER:**  May I, Your Honor?

21    **THE COURT:**  Yes.  Just with regard to the scope of

22    what was just asked.

23    **MR. BRONSTER:**  Yes, Your Honor.

24    /

25    /

1      **RECROSS-EXAMINATION**

2      BY MR. BRONSTER:

3      **Q.**   You say that you yourself are vaccinated for COVID?

4      **A.**   Correct.

5      **Q.**   Did you knowingly and intentionally participate in having

6      other people not get vaccinated but pretend that they did?

7      **A.**   Yes.

8      **Q.**   Okay.  Which is exactly what the Government has charged

9      you with; correct?

10     **A.**   Correct.

11             **MR. BRONSTER:**  Thank you.

12             **THE COURT:**  All right.  Is there anything else?

13             **MR. STRAIN:**  No, Your Honor.  This witness can be

14     excused.

15             **THE COURT:**  Okay.  Thank you for your testimony,

16     Ms. Burgoyne.  You are excused.

17             **MR. STRAIN:**  And, Your Honor, the last thing the

18     Government would offer is Defendants' Exhibit D1, I think is

19     what it's called.

20             **THE COURT:**  Right.  Do we need to play that, or is

21     it --

22             **MR. BRONSTER:**  Your Honor, we object to its

23     admission.  I marked it as an exhibit in anticipation that the

24     Government was going to offer their version; and if it was

25     admitted, I wanted it admitted with the full context.

1     But I absolutely object to its admission.  It has

2  nothing to do with the facts of the case.  It has nothing to do

3  with any issue in this hearing.  It is an expression of what

4  are essentially philosophical, political and, based on the

5  excerpt that I put in, even religious beliefs.  They have

6  nothing to do with this hearing.  And we respectfully object to

7  it being admitted for any purpose.

8     **THE COURT:**  All right.  Do you want to respond to

9  that, Mr. Strain?

10     **MR. STRAIN:**  No, we'll submit it, Judge.  However you

11  want to rule.

12     **THE COURT:**  All right.  I'm not going to rule on that

13  right now.  I will -- I'll think about that issue as you make

14  your arguments.

15     I will say this, though.  I have listened to the

16  Government's version earlier.  Without agreeing to its

17  admission or waiving your arguments that it's not relevant, do

18  you want to just briefly proffer what the material you added

19  would -- kind of just a brief summary of what the additional

20  material that's in your recording and not in the Government's

21  is about?

22     **MR. BRONSTER:**  Yes, Your Honor.  It's very short.  It

23  starts with a lead-in, I believe, of the interviewer asking

24  Dr. Moore about whether he believes, if I'm phrasing it right,

25  that he has some religious obligation to speak out, or

1    something like that.  It goes into his motivation.

2          I don't think it's particularly significant for the

3    hearing, any more than I think the other excerpt is.  But I'm

4    not telling you that Your Honor needs to listen to it to make

5    some critical decision.  I just -- I don't think the whole

6    thing is relevant.

7          **THE COURT:**  Got it.  Understood.

8          All right.  With that, that's the evidence that you

9    all wanted to submit, then, at this point; correct?

10          **MR. STRAIN:**  Correct, Judge.

11          **THE COURT:**  Is that right, Mr. Bronster?

12          **MR. BRONSTER:**  Yes, Your Honor.

13          **THE COURT:**  All right.  Now I'm going to give each of

14    you an opportunity to present argument in support of your

15    position.  As I indicated, I have carefully read the parties'

16    briefs, so there's no need to belabor everything you've said

17    there.

18          In addition to the points addressed in the briefs, I

19    am interested in argument regarding whether there are

20    additional conditions that I could impose that would help

21    Pretrial Services detect and thus deter communications such as

22    the Signal messages here, in the event that I conclude that

23    those violated Dr. Moore's condition of release -- conditions

24    of release.

25          So again, reserving that issue, which I know is the

1    subject of dispute.  That is something I am curious about, if

2    there are -- you know, what kind of conditions -- you know, if

3    I were to rule against Dr. Moore on the issue of it not being a

4    violation, you know, still, I -- you know, if there are

5    conditions that could detect these sort of communications going

6    forward.

7              And, again, without waiving your arguments, if you

8    have thoughts on that, Mr. Bronster, I'd like to hear them.  If

9    you don't have thoughts, that's fine.

10             This is Dr. Moore's motion to review, so I'm inclined

11   to let you go first, Mr. Bronster, for this part of the

12   hearing.

13             **MR. BRONSTER:**  Thank you, Your Honor.  And

14   although -- as much as I would like to go straight to

15   addressing the issue of other conditions, it's too much part

16   and parcel, I think, of some of the other arguments.  And I'm

17   not going to make them all.  I know that you're familiar with

18   the facts.

19             In point two of my brief, I made an argument about

20   the proper grammatical reading of the statute having to do with

21   codefendants versus potential codefendants.  I'm not going to

22   repeat that argument here.  I rely on my papers.

23             Point one is really, to me, the essence of this.  The

24   fact of the matter is that what the Government has done is

25   create a back door to doing exactly what the legislature does

1    not allow.  You cannot incarcerate a defendant pretrial unless

2    it is because he is a risk of flight or he is a danger to

3    others in the community.  And Magistrate Bennett, who had every

4    ability to make such a finding, if he thought it was

5    appropriate, did not.

6         Now, that doesn't mean that there's no remedy if

7    Dr. Moore violates a condition that doesn't implicate those

8    concerns.  There is.  There is a contempt proceeding, which is

9    a very serious matter and exposes him all over again to an

10   additional period of incarceration, an additional conviction.

11   That is a sufficient remedy.

12        And what it really goes back to, Your Honor, is that

13   I think there is some question of the propriety of the

14   codefendant condition that was imposed having been imposed.

15        Now, I will state very frankly that as far as I'm

16   aware, it was not objected to by the defendant.  And so having

17   waived it, I can't argue that it was improper for the

18   magistrate to impose it.

19        But what it created is something that doesn't usually

20   exist.  It was a condition that had no impact on risk of flight

21   or danger to the community.  And had I been in the case sooner,

22   I might have moved to have that condition stricken and dealt

23   with that legal issue then.  That's not the way it played out.

24        But the question is still, can you incarcerate

25   Dr. Moore for violating a condition that does not implicate the

1  two concerns that are the only reasons a defendant can be

2  incarcerated pretrial?  And the statute that authorizes

3  sanctions against a defendant who violates goes on and refers

4  back to Section 3142.  And you can't just get around it, not

5  when you're dealing with something as fundamental as the right

6  to liberty.

7         And, unfortunately, there is no binding case law on

8  this.  There are those cases out of Texas that we discussed in

9  the brief.  But, of course, they're not binding on this Court,

10 and they're not published decisions, and the Tenth Circuit has

11 never faced this issue.  And that's not all that surprising,

12 because, generally speaking, at a detention hearing, the

13 conditions that are going to be set for release are conditions

14 that are geared towards preventing the risk of flight and

15 danger to others.  So it's not all that amazing that it's never

16 been addressed.

17        But now that it has to be in this case, I

18 respectfully submit that the magistrate simply lacked the

19 authority to incarcerate Dr. Moore for violating a condition

20 when the magistrate did not find that it created a risk of

21 flight or a danger to the community or others.

22        **THE COURT:**  All right.

23        **MR. BRONSTER:**  Moving on from that, the next legal

24 point is the one that Your Honor has clearly already

25 appreciated and focused on, which is other conditions.  To

1    analyze what other conditions could be set, you have to really

2    look at the violation.  There are probably conditions we could

3    come up with that would further restrict Dr. Moore from

4    communicating with codefendants.  There was nothing in the

5    original conditions that said you can't have an account on

6    Signal.

7             Now, the Government wants to draw certain inferences

8    as to why they do it, but there are millions of people on that

9    application and applications like it.  It's a method of

10   communicating.  And the fact that Dr. Moore captions it "Legal

11   Defense" tells you, I think, everything you need to know about

12   what those texts were designed to be.

13            I would also point out that the magistrate made his

14   decision based on misinformation from the Government.  And I'm

15   not here to argue as to whether or not this was the critical

16   point that turned the magistrate's decision, but the

17   Government -- and I'm not saying in bad faith, but the

18   Government believed, erroneously, that the last two texts of

19   that song and the "one and done" came from Dr. Moore, and they

20   didn't.  Now, frankly, as I said in my brief, I think it's

21   innocuous anyway, but it didn't come from Dr. Moore.

22            So I am respectfully asking that the Court, rather

23   than imposing other conditions, solve the problem by removing

24   the condition about codefendant communication.

25            We have a trial coming up.  And there's still some

1    discussion to be had about when that trial is going to be, I

2    know, but there is a trial coming up that has to be prepared

3    for.  And there is nothing to prohibit, in terms of common

4    sense and reasonableness, the defendants from being able to

5    communicate with each other on things like coordinating

6    witnesses and, in the case of Ms. Andersen, I believe there may

7    have been a history of her attorney not coming to court when it

8    wasn't strictly necessary.  He's asking her and the other

9    defendant to have their attorneys come to court for a hearing.

10   Where is the harm?  What is the offense?  And that's the only

11   text that they've offered.

12           As far as what supposedly happened over a year ago at

13   these meetings, I think that Ms. Burgoyne's credibility is

14   shaky, to say the least.  And I really wish -- and, of course,

15   I understand the Court's ruling.  But I wish that the law had

16   allowed me the ability to call her attorney to the stand to see

17   if he was prepared to admit to malpractice on the record.

18           The concept that Ms. Burgoyne took the stand today

19   without knowing that the issue was Dr. Moore's liberty, and

20   then she testifies that she doesn't want to see him in jail, it

21   speaks for itself.  It is absolutely incredible.

22           And also what speaks for herself is the timing of her

23   coming forward.  More than a year after these meetings took

24   place, she suddenly has these completely innocuous texts that

25   she sees as an opportunity to stick it to Dr. Moore; not for

1    the sake of sticking it to Dr. Moore, but for two purposes.

2    Number one, and I'm sure it's the lesser purpose,

3    this lawsuit that she has, it's going to be a lot easier to

4    collect the $77,000 she thinks she's owed if Dr. Moore has to

5    be defending it from a jail cell.

6    But much more than that, Your Honor could already

7    write the script of what's going to happen next.  Ms. Burgoyne

8    is going to go in with her attorney, get a sweetheart deal,

9    she's never going to do a day in prison; and we all know that

10    that's the way the story has already been written.

11    So her credibility, I respectfully submit to you, is

12    suspect, at best, and should, in fact, be completely

13    disregarded.  And let's focus on the violation that's been the

14    subject of this hearing since the day of the arrest, and that

15    is these completely innocuous texts.

16    If the Court is not prepared to delete the provision

17    about communication from codefendants, then Dr. Moore has to

18    get it through his head that even something as innocuous as

19    have your attorney show up for the hearing is just not

20    permitted.  If it is now, for the first time, going to be a

21    restriction that he can't be on Signal or WhatsApp or one of

22    the many similar applications, then we can have that provision.

23    If the Court wants to impose a condition that he

24    needs to report on a weekly basis to his pretrial officer any

25    contact, even incidental, that he has with any codefendant in

1    the workplace or anywhere else, that can be done.  But, surely,

2    given the nature of the alleged violation and the de minimus

3    nature of it, there has to be a better way to fulfill the

4    statutory mandate than having Dr. Moore sit in prison, denied

5    of his liberty, denied of the right to consult freely and

6    adequately with counsel in preparation for trial, whenever that

7    trial may be.  There has to be something less draconian than

8    taking away his personal freedom.

9           I'm prepared to address any questions or any other

10   issues that Your Honor would like me to address.  Otherwise,

11   that would be my argument.

12          **THE COURT:**  No, I think -- I think that's what I

13   wanted to hear from you for now.  I'll want to hear from the

14   Government and give you a chance to reply.

15          Mr. Strain?

16          **MR. STRAIN:**  Your Honor, Mr. Bronster's reading of

17   Section 3142 and 3148 is interesting, but it's also totally

18   without support.

19          In this case, the question is, was there clear and

20   convincing evidence that there was a release violation?  Yes.

21   He met with and he spoke to -- communicated with his

22   codefendants, in direct violation of the Court's order.

23          Is he unlikely to abide by these release conditions

24   or additional release conditions?  Yes, and he's demonstrated

25   that.

1          Post-indictment, he engaged in more crime.  He

2     obstructed justice and destroyed evidence.

3          He held at least four months of weekly meetings with

4     his codefendants, in direct violation of the release condition.

5     That's approximately 16 meetings.  We don't know exactly what

6     was discussed, but we know that the case was discussed, in

7     violation of court orders.

8          And when it came to using communications over text

9     message, they used Signal to defeat the monitoring provisions

10    that were in place.  They were placed on Dr. Moore after he was

11    released.  The timing of exactly when Signal was set up is

12    still in question.  It sounds like it was a lot longer and more

13    extensive than we even knew about, as Mr. Bronster said.

14         But the point of using Signal, according to

15    Ms. Burgoyne, who testified, was to defeat the monitoring

16    provision, to make sure that the messages were encrypted, and

17    to make sure that they could continue to communicate.

18         And she testified again about the towel incident,

19    with covering up the GPS monitor.

20         These aren't trivial.  These aren't mistakes.  These

21    aren't incidental or isolated.  These are repeated, extensive,

22    deceptive, purposeful acts on Dr. Moore's part to violate his

23    pretrial release conditions.  And he has done it for virtually

24    the entire time he's been released.  I don't know if we can

25    point to a time when he's been released when he's been

1    compliant with his release conditions.

2          And so the Court's question, are there any additional

3    conditions that we can impose?  Not that I can think of,

4    because any conditions that were imposed, like GPS monitoring

5    or adding electronic device monitoring, he defeated those.  A

6    weekly report to Probation, that's not going to work.

7    Probation didn't find out about these violations; we did.  We

8    heard about it from Ms. Burgoyne, not from Pretrial.

9          So with that, Your Honor, I'll leave it.

10          **THE COURT:**  All right.

11          Do you want to reply to that, Mr. Bronster?

12          **MR. BRONSTER:**  Only for a minute.

13          Magistrate Judge Bennett dwelled on how intelligent

14    Dr. Moore is and the intelligence level it takes to graduate

15    medical school and to go into his profession.

16          Perhaps Ms. Burgoyne is stupid enough to think that a

17    ankle monitor can be used as a device for intercepting

18    conversations.  It seems unlikely that someone of Dr. Moore's

19    intelligence ever thought that or that the towel incident ever

20    happened.

21          And it also is notable that while Ms. Burgoyne

22    testified that they had these discussions where they talked

23    about the case, she never gave you even one specific detail.

24    As far as you know right now, these conversations were exactly

25    the same as this three-page text that you were given, where

1  there was a discussion of, "Well, who are the witnesses going

2  to be, and what are the attorneys going to do, and what are

3  they going to want to talk to?"

4       There was not one word from her about anything

5  nefarious, and certainly nothing about the things that the

6  statute is often concerned with, tampering with witnesses,

7  things like that.  There is a complete absence of any evidence

8  of anything like that.

9       Does that mean that having the meetings, that even

10  mentioning the fact that, "Hey, there's an indictment out

11  there" -- is that technically a violation of the magistrate's

12  order?  I suppose that, technically, it might be.  But you have

13  no evidence that there was anything beyond that, and so you

14  have to decide if those conversations, which, for all we know,

15  were exactly the same as these texts, justify depriving a man

16  of his liberty.

17       And there's one last thing I want to say.  The

18  decision of detention is initially one of law.  But after the

19  legal issue is decided, you have to address, as Judge Bennett

20  did -- if he didn't agree with the issues of law, and if

21  Your Honor does not, you have to address it as a matter of the

22  Court's discretion, weighing various factors.

23       The most important thing that we learned in this

24  courtroom from Ms. Burgoyne is that this sovereign citizen

25  nonsense that Magistrate Bennett hung his decision on, because

1    the history of his espousing that doctrine told him that

2    Dr. Moore is never going to do what he's told -- well,

3    Ms. Burgoyne gave you the answer.  She had the exact same

4    motion.  She took the exact same position.  She was personally

5    in contact with the exact same people, which she didn't want to

6    admit, but, eventually, she did.  And she sat there on the

7    stand and she denounced it and said, "Look, it was a strategy.

8    It didn't work.  I abandoned it.  I'm not part of that

9    movement.  It doesn't mean anything to me."

10          Well, Dr. Moore has been saying exactly the same

11   thing.  And the question is, why is the Government going to

12   stand here and say, "We can believe her about it, but we can't

13   believe him about it"?  She filed the exact same motion.  She

14   attended every one of the exact same meetings.  She

15   participated in the exact same chain of texts.  But the

16   Government has cast Dr. Moore as the villain and her as a poor,

17   innocent lamb.

18          So, respectfully, Your Honor, I think that the

19   magistrate, even on those issues where discretion was involved,

20   misapplied a huge emphasis on the sovereign citizen history of

21   this case.  And I would respectfully submit to Your Honor that

22   if it meant nothing to Ms. Burgoyne, Your Honor is entitled to

23   presume that Dr. Moore is telling the truth when he says that

24   it meant nothing to him either, and means nothing today, and

25   has no impact on how he will conduct himself.  Thank you.

1    **THE COURT:**  Thank you.  Let me ask you, Mr. Bronster,

2    do I have discretion?  I mean, if I found -- if you're wrong

3    about the reading of 3148(b), it does sound -- the text is

4    pretty mandatory.  It sounds that way.

5    **MR. BRONSTER:**  Well, I hate to even go in the

6    direction of conceding the interpretation.  But if that is

7    Your Honor's question, I do believe you have discretion,

8    because I still maintain, in -- you have to determine whether

9    there are any conditions that will keep -- that he will abide

10   to.  And I think that is a matter of discretion, because you

11   have to make a subjective judgment about the man, a judgment

12   that I hope you're going to be making, at this point, without

13   the same dogged fixation on sovereign citizen that has been

14   part of the record thus far.

15       And so to that extent, Your Honor, perhaps

16   "discretion" isn't the right word.  You have a subjective

17   decision to make.  And I hope that Your Honor will take into

18   consideration the subjective factors that I've indicated we

19   believe should be behind that decision.

20   **THE COURT:**  All right.  Thank you.

21   **MR. BRONSTER:**  Thank you.

22   **THE COURT:**  Anything else, Mr. Strain?

23   **MR. STRAIN:**  No, Your Honor.  Prepared to address the

24   issue of continuance, but whatever the Court wants.

25   **THE COURT:**  Let's bracket that for a minute.  I think

1    I understand your position on the continuance.  I think I

2    understand both of your positions on the continuance.  The only

3    thing I would say on that, at this point, is I -- maybe like

4    turning down the temperature a little bit on those arguments

5    might not go amiss.

6            All right.  With apologies, given the hour and the

7    need to conclude this, I want to retire for just a few minutes.

8    I need to kind of think through a couple things.  I think

9    you've given me some things to think about.

10           Before I do that, though, I mean -- I guess -- and

11   maybe this isn't really a fair question for you, Mr. Strain,

12   but, I mean, whether or not -- I mean, I guess the elephant in

13   the room here is why -- I mean, why Dr. Moore?  Why not

14   Dr. Moore, Ms. Burgoyne, and Ms. Andersen?

15           **MR. STRAIN:**  I love unfair questions, Judge.  I'm

16   happy to --

17           **THE COURT:**  You understand what I'm getting at.

18   Whether or not I have discretion, I guess you have discretion

19   in terms of charging, but -- but, I mean it sounds like they

20   all did the same thing.

21           **MR. STRAIN:**  Yes.

22           **THE COURT:**  You know, all three of them were at these

23   meetings that Ms. Burgoyne testified with.  All of them were

24   parties to these text messages that I've seen.

25           **MR. STRAIN:**  Yes.

1          **THE COURT:**  Why Dr. Moore and not the other two?

2          **MR. STRAIN:**  Well, we presented the information to

3   Probation.  Probation made the determination to seek to revoke

4   Dr. Moore and Ms. Andersen.  And our position in front of Judge

5   Bennett was to detain both Dr. Moore and Ms. Anderson.

6          Judge Bennett decided to allow Ms. Anderson to be

7   released, over our objections, and he did so because he found

8   that Dr. Moore was the one that was sort of the ringleader,

9   setting this up, influencing the other codefendants, and so he

10  felt that he was more culpable.

11         And so our position is that Ms. Andersen should be

12  detained, Judge, but unfortunately we lost that.  Yeah.

13         **THE COURT:**  Yeah.  Okay.  Understood.

14         **MR. STRAIN:**  Sorry.  And to answer your question

15  about Ms. Burgoyne, again, this is information that we wouldn't

16  have had unless she had come forward.  It doesn't seem

17  appropriate to punish her for that.

18         **THE COURT:**  Understood.

19         Do you have anything else you want to say about that,

20  Mr. Bronster?

21         **MR. BRONSTER:**  No, Your Honor.

22         **THE COURT:**  Okay.  Again, I need just a few minutes.

23  I'll return in not too long, so stay in your -- probably just

24  stay here.

25         **THE COURTROOM DEPUTY:**  All rise.

1          (A recess was taken.)

2          **THE COURT:**  All right.  Thank you for your

3    indulgence.

4          I will now issue my ruling.  We're on the record, and

5    the transcript of my oral ruling will serve as my opinion on

6    the motion.  That is, although my courtroom deputy will enter a

7    minute order stating the disposition of the motion, there will

8    not be a written opinion.

9          I want to get my transcript up again.  All right.

10         First, I find by clear and convincing evidence that

11   Dr. Moore violated a condition of his release.  Namely, that

12   Dr. Moore had contact --

13         Namely, I find that Dr. Moore had contact with two of

14   his codefendants and "talk[ed] about this case" with them, by

15   means of Signal messages on or about October 17th, 2024,

16   specifically on October 17th and October 18th, in violation of

17   Condition (6)(c).

18         Dr. Moore concedes that he communicated with two of

19   his codefendants by means of the Signal messages that the

20   Government identified, the ones that were admitted as exhibits.

21         To be sure, Dr. Moore offers several arguments that

22   the Signal messages did not violate Condition (6)(c), or that

23   this Condition is invalid or needs to be understood in a

24   particular way so as not to be invalid.

25         Dr. Moore first argues that he did not "talk about

this case" with his codefendants.

But in Dr. Moore's Signal message on October 17th, he reminded his codefendants that, "we have a hearing [tomorrow] about our motion to dismiss," and states that, "[i]t would be beneficial if you and your [attorneys] would be there."

Dr. Moore then asked Ms. Burgoyne to "speak to [his] [attorneys] and answer some of their questions regarding how we obtained the vials and [vaccine] cards," as that was "a part of the process [he] was not really involved in."

And Dr. Moore asked Ms. Andersen if she "kn[ew] of any of [their] patients that would be willing to testify as to [the] necessity of their getting a card that permitted them to stay employed," as he thought such testimony might be needed if they "los[t] the motion to dismiss and prevail[ed] in the motion regarding the necessity defense."

Dr. Moore suggests that this message did not constitute "talk[ing] about this case" because "it is nothing more than a coordination of court appearances and providing witness information to counsel."

Condition (6)(c) bars Dr. Moore and his codefendants from "talk[ing] about this case amongst themselves," without qualification.  It does not bar "talk[ing] about this case" in specific ways or in certain capacities; it bars "talk[ing] about this case," period, full stop.  Because Dr. Moore discussed a hearing in "this case" and the preparation of a

1   defense in "this case" with his codefendants, I find that he

2   clearly "talk[ed] about this case" with them.

3          Dr. Moore next argues that he did not "contact...any

4   person who is or may be an alleged victim, potential witness

5   and/or codefendant" because this phrase covers only potential

6   codefendants, not actual codefendants like Ms. Burgoyne and

7   Ms. Andersen.

8          That is, Dr. Moore argues that under "[t]he

9   grammatically correct reading" of the phrase "potential

10  witnesses and/or codefendant," the word "potential" modifies

11  both the word "witness" and the word "codefendant."

12         It does not really matter if Dr. Moore is correct,

13  however, given that Condition (6)(c) expressly provides that

14  "Defendants will not talk about this case among themselves" --

15  or "amongst themselves," in bold font, no less -- and, as I've

16  already concluded, Dr. Moore clearly violated that prohibition.

17         In all events, I disagree that Dr. Moore has

18  identified what he calls "[t]he grammatically correct reading"

19  of Condition (6)(c).

20         As the Tenth Circuit has explained, under the

21  "nearest-reasonable-referent canon" of interpretation, "an

22  adjective ordinarily modifies only the nearest word to which it

23  reasonably applies."  I'm quoting there from *Combs v. Jaguar*

24  *Energy Services, LLC*, 683 F. App'x 704, at page 706, from the

25  Tenth Circuit in 2017.

1    And while that opinion is unpublished, it cites in

2    support of that proposition Antonin Scalia and Bryan Garner,

3    *Reading Law*:  *The Interpretation of Legal Texts*," at 152 from

4    2012, which, in my view, is probably the preeminent commentary

5    on textual interpretation of legal texts.

6    And I find those authorities highly persuasive.

7    Applying the "nearest-reasonable-referent canon" to

8    Condition (6)(c), I conclude that the adjective "potential" is

9    best read to modify the nearby word "witness" and not the word

10   "codefendant," which is further away.

11   To be sure, Scalia and Garner explained that this

12   canon "normally" does not apply if an adjective precedes and

13   modifies a parallel series of nouns.  For example, if

14   Condition (6)(c) referred to a "potential witness, juror, or

15   codefendant," the word "potential" presumably would modify each

16   noun in the parallel series.  But in Condition (6)(c), the word

17   "potential" does not precede a parallel series.  To the

18   contrary, "potential witness" appears in the middle of such a

19   series, following the noun "alleged victim" and preceding the

20   noun "codefendant."

21   Dr. Moore also contends that his reading of

22   Condition (6)(c) is supported, indeed compelled, by 18 USC

23   Section 3142(c)(1)(B)(v), the statutory provision on which

24   Condition (6)(c) is based.

25   Section 3142(c)(1)(B)(v) permits a court to bar a

1  defendant, as a pretrial release condition, from "all contact

2  with an alleged victim of a crime and with a potential witness

3  who may testify concerning the offense."

4         Asserting that this provision is "designed to prevent

5  witness tampering," Dr. Moore argues that Condition (6)(c) must

6  be interpreted to cover only potential codefendants, insofar as

7  they are "people whom...defendant might...want to tamper with."

8         I disagree.

9         For one thing, it is far from clear that this

10  statutory provision is concerned only with witness tampering.

11  Certainly, the prohibition of "all contact with an alleged

12  victim of the crime" appears to sweep more broadly than that.

13         For another, even if this provision is only concerned

14  with witness tampering, there is no reason to think that

15  potential codefendants are more likely to be potential

16  witnesses than are actual codefendants.

17         In this very case, for example, it appears that at

18  least one of Dr. Moore's codefendants may testify against him

19  at trial.

20         Not surprisingly, in many decisions, courts have

21  recognized that Section 3142(c)(1)(B)(v) implicitly covers

22  actual codefendants because they are "potential witness[es] who

23  may testify concerning the offense," and they have expressly

24  relied on this statutory provision in rejecting challenges to

25  conditions expressly prohibiting all contacts with

1    codefendants.

2          For example, in *United States v. Pickel*, the Tenth

3    Circuit affirmed a district court's decision overruling an

4    objection to the pretrial condition a defendant "have no

5    contact with any codefendant or witness," citing the statute,

6    specifically, 3142(c)(1)(B)(v), and describing the condition as

7    covering "all potential witnesses."  And that's 500 F. App'x

8    771, at page 772, from the Tenth Circuit in 2012.

9          Similarly, in *United States v. Johnston*, Judge Nuffer

10   overruled a defendant's objection to a condition "prohibit[ing]

11   contact between the codefendants," expressly relying on the

12   same statutory provision, which, he emphasized, authorized

13   barring the defendant's contact with potential witnesses.  And

14   that's 2013 Westlaw 4027723, at *2, from the District of Utah,

15   August 7, 2013.

16         And in *United States v. Cota*, the court concluded

17   that it "[c]learly...had authority to impose the condition that

18   while on pretrial release [a] Defendant have no contact with

19   her codefendants, all of whom are potential witnesses to the

20   crime charged in this case."  And that's 2022 Westlaw 425997,

21   at *2, from the District of Kansas, February 11th, 2022.

22         The same position is also supported by the decision

23   in *United States v. Martinez*, which collects still other

24   authorities to the same effect.  And that's 2021 Westlaw

25   4169789, at *1, from the Southern District of Iowa,

1    September 13th, 2021.

2            Indeed, Dr. Moore has not cited any cases in which

3    courts have held that "no contact" conditions like Condition

4    (6)(c) are unenforceable as to codefendants, and I have not

5    found any such cases in my own research.

6            And while Dr. Moore suggests that the "interests" of

7    actual codefendants "are generally aligned," their interests

8    can clearly diverge, as when one actual codefendant decides to

9    testify against another.

10           By way of illustration, Dr. Moore himself notes

11   multiple ways in which the interests -- his interests and the

12   interests of his codefendant Ms. Burgoyne conflict.  As he puts

13   it in his brief, "[a]side from Burgoyne being a codefendant,

14   she and Dr. Moore are adversaries in a civil lawsuit over tens

15   of thousands of dollars' worth of medical equipment.  Both the

16   criminal and civil benefits to Burgoyne of turning in Dr. Moore

17   are self-evident.

18           In all events, even if Condition (6)(c) is not

19   perfectly consistent with Section 3142(c)(1)(B)(v), the text

20   and structure of Section 3142(c)(1)(B) leave no room for doubt

21   that the list of enumerated conditions is not exhaustive.

22           Finally, on this point, I reject Dr. Moore's argument

23   that Condition (6)(c) is somehow invalid or improper.

24           To the extent Dr. Moore argues that Condition (6)(c)

25   violates Section 3142(c)(1)(B), I reject that argument for

1    essentially the reasons I have just discussed.

2         Dr. Moore also contends that "[i]t is arguable

3    whether or not an absolute prohibition against speaking to

4    codefendants can withstand a constitutional challenge, in view

5    of the defendant's Sixth Amendment right to a fair trial.

6         But Dr. Moore does not cite any case law to support

7    the proposition that a release condition barring codefendants

8    from communicating violates the Sixth Amendment.

9         As discussed previously, release conditions like

10    Condition (6)(c) are common and have been uniformly enforced by

11    courts, and I have not found any cases in which courts have

12    declared such conditions unconstitutional.

13         To the contrary, "courts sometimes impose no-contact

14    orders even between married co-defendants," which are

15    significantly more restrictive than the "no contact" order

16    here.  And I'm quoting here from *United States v. Martinez*,

17    which also collects other cases to the same effect.  And that's

18    2021 Westlaw 4169789, at *1, from the Southern District of

19    Iowa, September 13th, 2021.

20         Finally, I am not persuaded by Dr. Moore's argument

21    that Condition (6)(c) impairs his ability to present a defense,

22    or even to do so in coordination with his codefendants if they

23    wish to do.

24         So.  As Judge Bennett noted, Condition (6)(c) does

25    not prevent Dr. Moore's lawyers from talking with his

1    codefendants' lawyers about the case.

2         The condition clearly does not prevent Dr. Moore from

3    talking with his lawyers about this case.  It does not prevent

4    his codefendants from talking to their lawyers.  For that

5    matter, it does not prohibit any of the codefendants from

6    talking to the lawyers of the other defendants.

7         It follows that Dr. Moore is perfectly capable of

8    coordinating his defense with his codefendants, if they wish to

9    do so, while also complying with Condition (6)(c).  The

10   condition simply requires that any coordination take place

11   through Dr. Moore and the codefendants' lawyers.

12        As Judge Bennett explained, "[t]his condition does

13   not adversely impact the defendant's ability to prepare a

14   defense because, as the court recognized, they have the ability

15   to communicate through counsel, both their own and with other

16   codefendants' counsel who are within the defendants' joint

17   defense agreement.

18        For all of these reasons, I reject Dr. Moore's

19   argument that his Signal messages did not violate Condition

20   (6)(c) or that his violation should be excused because that

21   condition is invalid or improper.

22        All right.  Now, that's half of the inquiry.

23        The other half, even on the Government's view, is

24   whether Dr. Moore is unlikely to abide by any condition or

25   combination of conditions of release.

1          In my opinion, this is a close question.  However, I

2    do not find -- I do not think I can find that Dr. Moore is

3    unlikely to abide by any condition or combination of conditions

4    of release.

5          It is true that this is not his first non-compliance.

6    And in my view, his past non-compliance does weigh in favor of

7    a finding that future non-compliance is likely.  In fact, he's

8    violated the conditions of his release, it appears, on multiple

9    occasions.

10         Based on the testimony and the evidence, though, it

11   appears to me that most of the non-compliance occurred before

12   his first incarceration.  Certainly, that is the case with

13   respect to the passport and the failure to be processed.

14         Based on Ms. Burgoyne's testimony, it also sounds as

15   though most of the meetings that occurred also took place

16   before his release.  And it sounds like this is also the period

17   when the Signal messaging service was set up and that Dr. Moore

18   asked his codefendants to download the app.

19         After that first incarceration, what we have is that

20   there may have been more meetings.  We have testimony with

21   regard to one meeting.  But according to Ms. Burgoyne, it

22   sounds as though even that meeting took place some time ago.

23   And it doesn't sound as though there have been any recent

24   meetings like that.

25         We also have the recent message.  Now, I know that

1    Judge Bennett noted that the fact that they had a group chat

2    named "Legal Defense" suggested that the messaging was not a

3    one-time deal.  Looking at the exhibit, though, it appears that

4    Ms. Burgoyne was added to that group at the time the message

5    was sent on October 17th.  So I don't think I can find, based

6    on the evidence that's been presented, that there was some kind

7    of ongoing chat group called "Legal Defense" that predates

8    these texts.

9          Now, Ms. Burgoyne did testify that they had set up

10   these -- at Dr. Moore's request, they'd set up these Signal

11   apps at the time they were having meetings.  Though, as I said,

12   most of the meetings, nearly all of them, perhaps, occurred

13   before the first detention.  But she also testified that she

14   had not had any messages for quite a while.  It sounded to me

15   like this kind of came out of the blue, in fact.

16         We also don't have any -- it sounds as though they

17   may have used -- I think it's a fair inference that they may

18   have used the app around the time they were actively meeting

19   together.  But, again, her testimony appears to be that there

20   were not any messages recently, other than the ones that were

21   turned over.  We also have no evidence of the content of those

22   messages.

23         Now, it's true there's a number of instances of

24   violations.  And any violations are serious.  But as I said,

25   most of them were before the first revocation, and I don't

1    think I can find that they are -- I don't think I can find,

2    based on the evidence before me, that they're pervasive and

3    ongoing, let alone so pervasive and ongoing that I should

4    conclude, by a preponderance of evidence, that future

5    non-compliance is likely.

6         Though, as I said, I think it's a close question.

7    But as I sit here right now, the non-compliance that I think I

8    have evidence of that postdates the first revocation is one,

9    possibly more meetings, but none for quite a while and these --

10   the messages that were exchanged on October 17th and 18th.

11        Judge Bennett also relied on Dr. Moore's frivolous

12   challenges to the court's jurisdiction as evidence that future

13   non-compliance is likely.  But Dr. Moore has expressly

14   renounced these arguments, these sovereign citizen-type

15   arguments, in subsequent court filings.  There's no evidence in

16   the filings that he's made through counsel since that time, or

17   otherwise in the evidence, that he continues to believe that

18   the court lacks jurisdiction over him.

19        I therefore do not conclude that his past invocation

20   of these frankly silly arguments weigh in favor of a finding

21   that future non-compliance is likely.

22        Finally, Dr. Moore represented in his briefing that

23   his detention has presented personal hardships because of his

24   family responsibilities.  I am hopeful, and I conclude, that

25   that experience will encourage him to abide by his release

1  conditions to avoid further detention.

2       I conclude that it's likely that the period that

3  Dr. Moore has spent in custody has impressed upon him the

4  importance of strictly complying with his conditions of

5  supervision.

6       For these reasons, I conclude that the Government has

7  not shown that Dr. Moore is unlikely to abide by any condition

8  or combination of conditions of release, and I accordingly

9  conclude that detention is not warranted under Section 3148(b).

10      Again, though, I think this is a close case.  And I

11  think there is clear evidence of non-compliance.

12      I do not -- I'm not going to make a finding on this

13  point, but I'm inclined to think that at least some of the

14  non-compliance has been willful.  I don't know if -- I'm not

15  going to make a finding especially about the recent text.  But,

16  clearly, some of the early non-compliance was willful, and

17  that's concerning to me.

18      I want to be very clear, though.  This -- we can't

19  have this happen again.  You know, there may have been some

20  question about, you know, this communication being innocuous,

21  but the bottom line is just, any communications have to be

22  through counsel.  Any coordination has to be through counsel.

23      And so, again, if this happens again, I think I'll

24  have little choice but to -- you know, to direct detention

25  pending trial.  But I don't think -- based on what I have right

1    now, I don't think I can find that Dr. Moore just will not

2    comply with his conditions.  I think -- I think -- I think I

3    still conclude that he will comply.  Based on his experience,

4    especially the last couple weeks in jail, I suspect has

5    impressed upon him the importance of complying.

6            Because this is a close case, I do think it's

7    appropriate to impose some additional conditions of release to

8    ensure that we don't have future violations of Condition

9    (6)(c).

10           It appears to me, based on the evidence and what's

11    unfolded, that the Signal messaging app was not something that

12    Pretrial Services detected or monitored for.  I therefore am

13    inclined to impose a condition limiting Dr. Moore's electronic

14    communications to methods that are detectable, specifically

15    traditional phone calls and traditional text messaging and

16    e-mail, and to prohibit using any kind of messaging or

17    telephonic applications apart from this kind of standard -- you

18    know, the standard phone app or whatever, the standard

19    messaging app.  I think I do want to limit his communications

20    to e-mail, social media, traditional text messaging,

21    traditional phone calls, just to make sure that -- to provide a

22    means of detecting and deterring potential communications.

23           I'm also inclined to impose, as a new condition, a

24    condition that would authorize Pretrial Services to conduct

25    random searches of Dr. Moore's phone, random, unannounced

1    searches of his phone and computer.

2          Those are what I can think of.  I would welcome other

3    thoughts, and we'll get to that in a minute.  But because I

4    conclude that Section 3148(b)(2) is not satisfied, I am not

5    going to address Dr. Moore's interesting, perhaps "creative"

6    would be a good word, argument that detention is impermissible

7    under Section 3148(b) because he's not a danger or a flight

8    risk.  It is an interesting statutory argument.  It is not one

9    that has had much currency in the federal courts.  I'll just

10   put it that way.

11         Also, for essentially the reasons I've already

12   discussed, I deny Dr. Moore's request to strike Condition

13   (6)(c).  That condition stands, and I want to be clear that it

14   means what it says.

15         For the foregoing reasons, the Motion to Revoke or

16   Amend the Detention Order Entered by Judge Bennett is granted.

17         Now, I'm going to direct the parties and the Pretrial

18   officer to prepare a release order with conditions for my

19   review.  As I indicated, I want these to include conditions

20   that bar Dr. Moore from using electronic messaging services or

21   other communication services, including Signal, not so limited

22   that it cannot be readily monitored by Pretrial Services, and

23   limiting his electronic communications to traditional phone

24   calls, traditional text messaging, e-mail, and social media.

25   And I think it could legitimately limit it to enumerated social

1    media, too.

2           I want it to require or authorize random searches by

3    Pretrial Services of Dr. Moore's -- any smartphones he has, as

4    well as his computer, or any computers that he uses.

5           And also, whatever other conditions that the Pretrial

6    officer and the parties deem appropriate to ensure that

7    Dr. Moore does not communicate with his codefendants.  You

8    know, and I want that submitted for my review and approval.

9           Once I've approved and entered the proposed release

10   order, I will direct that Dr. Moore be released.  So I want

11   that -- you know, obviously, time is of the essence, given that

12   Dr. Moore is detained, so I want the parties to work on that

13   promptly.  You know, I would be willing to -- I'd be willing to

14   look at it over the holidays or tomorrow, tonight, whatever.

15   But I do -- I do need a viable release order that contains

16   conditions along the lines that I've described in place before

17   I can order release.

18           **MR. BRONSTER:**  If the Government can accommodate it,

19   I'm prepared to go to their office from this hearing to work on

20   that so that we can get Dr. Moore out as quickly as possible.

21           **THE COURT:**  All right.  Well, I'll let you discuss

22   that among yourselves.  But I do want you to work on that in

23   good faith, without any unwarranted delay, all of the parties.

24           And, again, I want to emphasize that I think this was

25   a close question.  I don't think the Government -- the request

1   for detention was unwarranted here.  I think it's an

2   exceedingly close question.  And I hope I'm not right.

3           But I do want -- Dr. Moore, I want to be clear.  I

4   do -- you really do need to be on your best behavior and be

5   just meticulous about complying with these conditions going

6   forward.

7           **THE DEFENDANT:**  Yes, sir.

8           **THE COURT:**  All right.  Because I don't think I can

9   do this -- if we have more violations, I don't think I can do

10  this a second time.

11          **THE DEFENDANT:**  All right.

12          **THE COURT:**  All right.  Now, because of my ruling, I

13  guess we do have to discuss -- I gather Dr. Moore is requesting

14  a continuance in the event that he is released.

15          Mr. Bronster, is that correct?

16          **MR. BRONSTER:**  It is, Your Honor.

17          **THE COURT:**  Now, I understand that the Government has

18  filed a demand for a speedy trial.  That's Docket No. 214.  The

19  Government opposes Dr. Moore's request for a continuance

20  because Mr. Bronster represented that he 'is fully prepared to

21  try the case alone [in January] should that be necessary."  And

22  argues, on that basis, that I cannot make the findings

23  necessary to grant a continuance under *United States v. Toombs*

24  and the Speedy Trial Act.

25          Dr. Moore responds that despite Mr. Bronster's

1    representation, that continuance is warranted because "the ends

2    of justice served by...granting" a "continuance outweigh the

3    best interests of the public and the defendant in a speedy

4    trial."

5            Now, I've read your briefing on this.  I understand

6    your position.  I understand that the Government -- let me back

7    up.

8            So my understanding of where we left things at the

9    last hearing we had was that I had requested -- that we had

10   discussed a potential continuance.  I had indicated my

11   willingness to grant it.  I had not, in fact, entered a

12   continuance, though I certainly have not made the required

13   findings under the Speedy Trial Act.  And I'd requested a

14   motion, not a draft order, though I did indicate that I -- you

15   know, I would be fine with that, and I had effectively, like,

16   approved the motion in advance.  But I did not make the

17   findings on the record.

18           And given that, I felt that it was not unreasonable,

19   given the change in circumstances, for the defendant to want to

20   withdraw that motion.  It seemed -- and given the January trial

21   date, I felt that it was imperative that we get a trial

22   schedule in place, just because -- especially with the holidays

23   it was -- you know, we just needed to get that moving, if

24   that's where we were headed.

25           And I, candidly, thought at that time that -- I

1  wasn't sure how I was going to rule on the motion for

2  detention.  I thought it -- you know, from the time I read

3  Judge Bennett's ruling, I thought it presented a close

4  question, and I thought there was a reasonable chance that I

5  might go the other way.  And if that was the case, I thought

6  that the defendant was entitled to go to trial as scheduled.

7  And that's why I entered the trial order.

8         Now, I understand that it's been difficult to comply

9  with that and to get ready for trial.  And the Government very

10  much wants to go forward with the case.  It's started the

11  wheels in motion.  So I understand that.

12        I also understand that Dr. -- that, excuse me,

13  Mr. Drake has medical issues that, you know, he may be able to

14  accommodate, but it would make his participation at the January

15  trial difficult and perhaps impossible.

16        I understand that Mr. Bronster, in accordance with

17  his client's wishes, had his client remain detained, was

18  willing to do his best and try the case by himself, if needed,

19  just to get it over with so his client didn't have to stay in

20  jail until July.

21        And I guess what I'd like to say is I think both

22  sides' position on the continuance is reasonable, and I

23  don't -- I think I'd like to turn down the temperature on it

24  just a little bit.  I really don't -- I didn't find anything

25  incomprehensible about your wanting a conditional continuance

1  but not if he was going to be detained.  And I don't find

2  anything unreasonable about the Government at first wanting to

3  stick by, you know, the agreed-upon July schedule, and then

4  once I'd made clear that they had to start preparing for

5  January, you know, wanting to go forward.  They've kind of set

6  the wheels in motion.

7          So I think -- again, I don't think, like, the kind of

8  invective that's been exchanged is really helpful or -- you

9  know, again, I think both parties on this position are acting

10  in good faith and reasonably with what they're saying.  I just

11  don't -- I don't think there's, like, inconsistency, let alone

12  incomprehensibility, with the arguments that either side has

13  presented.

14          That said, if there's anything you want to add to

15  what's in your briefs on the continuance, I'll give you just a

16  few moments to say it.  I think I understand your positions.

17          You've set your wheels in motion.  You're ready to

18  go.  You don't want to call it off.  It's potentially a waste

19  of time.

20          You feel like your client would be better prepared,

21  would have both of his counsel and so forth, if you can have

22  until January.

23          Okay.  First of all, I'll give each of you a chance

24  to say whether I've got your position right and also just to

25  say anything else you want to say on that issue.

1      And, Mr. Bronster, do you still want the continuance,

2   or do you want -- and do you want -- and do you have anything to add to what

3   you've said?

4          **MR. BRONSTER:**  We still very much want the

5   continuance.  I could speak on it at great length, but it's

6   clear that Your Honor has understood all of the issues.  And I

7   have no doubt that Your Honor is able to set aside those parts

8   of the briefs on both sides that are somewhat higher than the

9   temperature that Your Honor is indicating and address it on the

10   merits.  And I believe that Your Honor knows all of the

11   pertinent considerations and can make the decision.

12          **THE COURT:**  All right.

13          Does the Government -- Mr. Strain, do you want to

14   speak to that?  Do you have anything to add?

15          I think I -- I definitely understand your position,

16   but -- as I stated it.  But if there's more to it than that or

17   other points you want to make, I'd like to hear it.

18          **MR. STRAIN:**  I think, just for clarification of what

19   our position is, Your Honor, all of the original bases that

20   were provided by the defense to continue the trial were valid.

21   And we understood them as such and they were sufficient to toll

22   the time, so we weren't contesting that.

23          But now we have a record where defense has stated

24   they can be ready in January, and they have moved for a speedy

25   trial on the record.  And in our view, the once-proffered bases

1    are now inadequate, and a pretrial release of a defendant is

2    not a basis to continue the trial.

3         And I would just say this, too, Your Honor, just so

4    that the Court completely understands and appreciates our

5    position.  If the case is dismissed later on by motion of the

6    defendant for speedy trial violations, the Court is going to

7    engage in an analysis to determine which party was at fault,

8    which caused the speedy trial violation.

9         **THE COURT:**  Are you talking about -- just to be

10   clear, you're talking about Speedy Trial Act violation or a

11   speedy trial clause, constitutional violation?

12        **MR. STRAIN:**  Speedy Trial Act violation, Judge.

13        **THE COURT:**  Okay.

14        **MR. STRAIN:**  The clause is a bit less strict in terms

15   of with or without prejudice.  I think it's as to

16   constitutional violation, it's always dismissed.  I could be

17   wrong about that.

18        But if we're talking about just a Speedy Trial Act

19   violation, then the Court will engage in that analysis.  And if

20   the Government has contributed in any way to that violation, it

21   gives ammunition for defense counsel to argue that the Court

22   should dismiss with prejudice.

23        And so in this instance, where the record is now so

24   muddy, we really have no ability to do anything other than

25   object to any continuance going forward.  And so we do

1    officially, Judge, object to the trial being continued.

2    However, we understand that the original bases were valid.  We

3    understand the defense's need, want, desire for the

4    continuance.  And so that's -- I'll leave the record at that,

5    Judge.

6                **THE COURT:**  Okay.  Thank you.

7                And let me just ask you this on the record, to be

8    crystal clear.  And if you need -- Mr. Bronster, if you need to

9    confer with Dr. Moore, that's fine.

10               Do you, on the record, waive any objection under

11   either the Speedy Trial Act or the Speedy Trial Clause of the

12   Constitution based on a delay from January to July?

13               **MR. BRONSTER:**  I do, Your Honor.  And in deference to

14   Mr. Strain's concerns, which I'm in a position to appreciate, I

15   tried, in my brief, to make sure that our position was as clear

16   as it could possibly be that we are waiving such a claim and

17   that any adjournment of the trial at this point is being done

18   specifically and exclusively because Your Honor is

19   accommodating some of the statutory and constitutional concerns

20   that the defendant has, and that it is purely his request for

21   the continuance.

22               **THE COURT:**  Okay.  And, again, just to put an even

23   finer point on that, do you agree that, for purposes of any

24   Speedy Trial Act or Speedy Trial Clause analysis, any delay

25   between January and July would be chargeable to the defendant

1    and not to the Government?

2        **MR. BRONSTER:**  I absolutely do, and I have my

3    client's authority to make that representation.

4        **THE COURT:**  Okay.  Well, I think that is -- that, I

5    think, is helpful.

6        And I -- leaving aside the issues of, you know,

7    whether I can make the requisite findings, which is a separate

8    issue which I'll get to in a minute, in terms of your concerns

9    about a potential motion to dismiss, is there anything else

10   that you think needs to be on the record, Mr. Strain?

11       **MR. STRAIN:**  Judge, I think I did say that it's a

12   recipe for trying the case twice.  After Mr. Bronster reacted

13   to that, I did go back into the record and looked at 3162(a)(2)

14   under the Speedy Trial Act.  And it does say, "Failure of a

15   defendant to move for dismissal prior to trial or prior to the

16   entry of a plea of guilty shall constitute a waiver" --

17       **THE COURT:**  Yeah, that is a waiver.  You can't -- a

18   defendant can't go to trial and then raise the issue.  It has

19   to be raised before the trial.

20       **MR. STRAIN:**  However, we have seen instances where

21   the trial has been completed, and then defendants post-trial

22   moved for ineffective assistance in not seeking a speedy trial

23   violation.  So there's really no safety, but that was the only

24   other thing that I wanted to clarify for the Court.

25       **THE COURT:**  Understood.  So I guess -- and I don't

1    think there's any possible way of waiving in advance an IAC, an

2    ineffective assistance claim, but I am skeptical of the merits

3    of such a claim, let's just put it that way, based on this

4    issue, at least.

5            Okay.  I'm going to grant the motion for a

6    continuance.  I think counsel for Dr. Moore represents that

7    David Drake, a key part of his defense team, has several cancer

8    surgeries scheduled in the near future, and that his recovery

9    from those surgeries will conflict with the January trial date.

10           While counsel for Dr. Moore has represented that

11   Mr. Drake will make whatever efforts he can to reschedule his

12   surgeries so as to be available for trial in January, counsel

13   recognized that scheduling might not be possible.  And while

14   Mr. Bronster has represented that he can prepare adequately for

15   the January trial and do it himself, and that the failure to

16   grant a continuance would accordingly not deny counsel for the

17   defendant the reasonable time necessary for effective

18   preparation, an independent consideration that may justify a

19   continuance under the Speedy Trial Act is whether failure to

20   grant a continuance would unreasonably deny the defendant

21   continuity of counsel.

22           I find that the failure to grant a continuance here

23   would likely deny Dr. Moore continuity of counsel because

24   Mr. Drake probably will not be able to prepare for and

25   participate in a January trial.

1          I also note, candidly, I have some concerns about

2    continuity of counsel.  Even if Mr. Bronster is willing to try

3    the case by himself in January, I'm not sure, candidly -- I

4    would have to make a judgment call, under our local rules,

5    whether it would be appropriate to allow him to do so without

6    Mr. Drake being here, given that Mr. Bronster is appearing pro

7    hoc vice and, you know, under the supervision and sponsorship

8    of Mr. Drake.  Ordinarily, in those sorts of circumstances, we

9    like the local lawyer to be present as well as the sponsored

10   lawyer.  I don't know that that's an absolute rule, but it does

11   give me some pause to try and hold the trial without Mr. Drake.

12         As I said, regardless of that, and in addition to

13   that, I think not continuing the trial, in light of Mr. Drake's

14   medical circumstances, would unreasonably deny the defendant

15   continuity of counsel.

16         And as far as unreasonably goes, I find that it would

17   be unreasonable because I think Dr. Moore's interest in

18   having -- and my interest, candidly, under the rule, the pro

19   hac vice rules, in having Mr. Drake participate outweigh

20   Dr. Moore and the public's interest in a speedy trial.

21         I also find that the failure to grant a continuance

22   would result in a miscarriage of justice because it would limit

23   Dr. Moore, quite likely, to one lawyer rather than the two that

24   he retained and that he has relied upon to present his defense.

25         For all these reasons, I find that the ends of

1    justice served by such a continuance outweigh the best

2    interests of the public and the defendant in a speedy trial.

3         Accordingly, I find that the facts here support a

4    continuance of the trial date and provide good cause for

5    excluding time under the Speedy Trial Act.  Based on that, and

6    in accordance with our discussion at the last hearing, the

7    trial in this case is hereby continued until July 7th, 2025.

8    All time from now until July 7th, 2025 is excluded for purposes

9    of the Speedy Trial Act.  And we will proceed in accordance

10   with the schedule that I outlined at the previous hearing

11   that's set forth in the minute order. I probably should have

12   been more careful in that minute entry.  I did not anticipate

13   how events unfolded.  Those dates were clearly intended to be

14   contingent on the filing and granting of a motion to continue.

15   But now the request for a continuance has been renewed, I've

16   granted it on the record so that now, at this point, the

17   continuance and those dates stand.

18         All right.  Is there any -- okay.  Any questions

19   about my ruling so far and what I -- again, I -- this has been

20   chaotic.  I know that there's probably -- you know, the

21   Government's probably not happy about devoting resources to

22   trial preparation.  Hopefully, it's not -- you know, that's

23   assuming there's no resolution, presumably the trial's close

24   enough that those -- many of those preparations at least will

25   still be usable and still be something you won't have to just

```
 1   repeat.
 2            All right.  And I said, I think it is important that
 3   while we have started -- we have started with the schedule that
 4   I had set in the trial order, we certainly have not completed
 5   it.  And we're still relatively early in that process, so I
 6   think the interests in going through with it are much less than
 7   they would be, say, around December 19th, when all of your
 8   submissions were due.
 9            Okay.  So to be clear, we'll go forward with the
10   trial schedule as discussed at the last hearing.  I need a
11   release order as soon as you all can come up with it.  I want
12   it to have the conditions, provide some additional tools --
13   some additional restrictions and some additional tools for
14   Pretrial Services to avoid the kind of violation that we had
15   here, or at least to deter it and to make it more likely to
16   detect it.  And I want the parties to work together in good
17   faith to get something proposed to me as soon as possible.
18            Any questions about any of that?
19            MR. STRAIN:  No, Your Honor.
20            THE COURT:  Any questions from you?
21            MR. BRONSTER:  No, Your Honor.
22            THE COURT:  And let me ask you, Ms. Wahlen, did you
23   kind of understand what I was looking for for the additional
24   conditions?
25            MS. WAHLEN:  What was that, Your Honor?
```

1      **THE COURT:**  Did you understand the types of

2  additional conditions I was looking for?

3      **MS. WAHLEN:**  Yes, Your Honor.

4      **THE COURT:**  Okay.  Good.  And if you can be helpful

5  to the conversation in preparing the release order, that

6  would -- I'd appreciate that as well.

7      Okay.  As I said, the key things are the restriction

8  on -- you know, restricting his electronic communications to

9  means that are -- that everyone knows about and that you can

10  detect and monitor for, and also having a provision for random

11  searches.

12      All right.  Any questions -- did you have any -- did

13  I already -- I already asked if you had questions, did I not?

14      **MR. BRONSTER:**  Yes.  Nothing, Your Honor, except to

15  thank the Court for the time and effort that you've put into

16  this.  I appreciate it, as does my client.

17      **THE COURT:**  All right.  Very well.

18      Is there anything else we should discuss at this

19  time?

20      **MR. STRAIN:**  No, Your Honor.  Thank you for

21  accommodating the extra time.  Turns out we were able to

22  complete that brief just before the Friday deadline.  So,

23  anyway, thank you for --

24      **THE COURT:**  Yeah.  And, again, I -- just given the

25  stakes, I thought it was important to get this done quickly,

1    both in terms of the liberty interests of Dr. Moore, which are

2    obvious, but also just given the unfolding trial order.  While

3    I realize that, you know, you've put work into it over the last

4    couple weeks, I think the longer we went on, the harder that

5    would be to kind of stop that.

6              **MR. STRAIN:**  Thank you, Judge.

7              **THE COURT:**  And I want to emphasize again that I do

8    not think that the Government's position in pursuing detention

9    or that your position in seeking review promptly -- I don't

10   think that anyone's acted in bad faith or frivolously with

11   regard to the lawyers here.  I just want to be clear about

12   that.  And I think -- again, you know, I'm talking about the

13   lawyers.  I'm not speaking about the underlying violations.

14             But I don't think it was inappropriate for the

15   Government to seek detention.  I don't think it was -- it

16   certainly was not inappropriate for you to seek review of it.

17   And I don't think anyone's position on the Speedy Trial Act and

18   the continuance has been in bad faith or unreasonable, either.

19   And I just wanted to be very clear about all of that on the

20   record.

21             All right.  With that, we will recess.

22             (Concluded at 5:25 p.m.)

23

24

25

1   CERTIFICATE OF COURT REPORTER

2

3        This is to certify that the proceedings in the

4   foregoing matter were reported by me in stenotype and

5   thereafter transcribed into written form;

6        That said proceedings were taken at the time and

7   place herein named;

8        I further certify that I am not of kin or otherwise

9   associated with any of the parties of said cause of action and

10  that I am not interested in the event thereof.

11       In witness whereof I have subscribed my name this

12  26th day of November 2024.

13

14  _____

15  Teena Green, RPR, CSR, CRR, CBC

16

17

18

19

20

21

22

23

24

25